| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* [UNDER SEAL] *et al.*<br><br>Plaintiff,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.  15-14106-LTS<br>The Honorable Judge Leo T. Sorokin |

<u>FILED UNDER SEAL</u>

<u>AMENDED COMPLAINT</u>

_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* | ) | |
| **ELIZABETH REIGART,** | ) | |
| 1713 Greystone Blvd., #38 | ) | |
| Mount Pleasant, SC  29464. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF CALIFORNIA | ) | |
| *ex rel.* ELIZABETH REIGART, | ) | |
| | ) | |
| and | ) | Civil Action No. 15-14106-LTS |
| | ) | The Honorable Judge Leo T. Sorokin |
| STATE OF COLORADO | ) | |
| *ex rel.* ELIZABETH REIGART, | ) | **FILED UNDER SEAL** |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF DELAWARE | ) | |
| *ex rel.* ELIZABETH REIGART, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF FLORIDA | ) | |
| *ex rel.* ELIZABETH REIGART, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF GEORGIA | ) | |
| *ex rel.* ELIZABETH REIGART, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF ILLINOIS | ) | |
| *ex rel.* ELIZABETH REIGART, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF INDIANA | ) | |
| *ex rel.* ELIZABETH REIGART, | ) | |
| | ) | |
| and | ) | |
| | ) | |

STATE OF IOWA                                    )
*ex rel.* ELIZABETH REIGART,                     )
                                                 )
and                                              )
                                                 )
STATE OF MARYLAND                                )
*ex rel.* ELIZABETH REIGART,                     )
                                                 )
and                                              )
                                                 )
COMMONWEALTH OF MASSACHUSETTS                    )
*ex rel.* ELIZABETH REIGART,                     )
                                                 )
and                                              )
                                                 )
STATE OF MICHIGAN                                )
*ex rel.* ELIZABETH REIGART,                     )
                                                 )
and                                              )
                                                 )
STATE OF MINNESOTA                               )
*ex rel.* ELIZABETH REIGART,                     )
                                                 )
and                                              )
                                                 )
STATE OF NEVADA                                  )
*ex rel.* ELIZABETH REIGART,                     )
                                                 )
and                                              )
                                                 )
STATE OF NEW JERSEY                              )
*ex rel.* ELIZABETH REIGART,                     )
                                                 )
and                                              )
                                                 )
STATE OF NEW MEXICO                              )
*ex rel.* ELIZABETH REIGART,                     )
                                                 )
and                                              )
                                                 )
STATE OF NEW YORK                                )
*ex rel.* ELIZABETH REIGART,                     )
                                                 )
and                                              )
                                                 )
STATE OF NORTH CAROLINA                          )

*ex rel.* ELIZABETH REIGART,       )
                                           )

and                                 )
                                           )

STATE OF OKLAHOMA           )
*ex rel.* ELIZABETH REIGART,       )
                                           )

and                                 )
                                           )

STATE OF RHODE ISLAND      )
*ex rel.* ELIZABETH REIGART,       )
                                           )

and                                 )
                                           )

STATE OF TENNESSEE          )
*ex rel.* ELIZABETH REIGART,       )
                                           )

and                                 )
                                           )

STATE OF TEXAS              )
*ex rel.* ELIZABETH REIGART,       )
                                           )

and                                 )
                                           )

STATE OF VERMONT            )
*ex rel.* ELIZABETH REIGART,       )
                                           )

and                                 )
                                           )

COMMONWEALTH OF VIRGINIA  )
*ex rel.* ELIZABETH REIGART,       )
                                           )

and                                 )
                                           )

STATE OF WASHINGTON      )
*ex rel.* ELIZABETH REIGART,       )
                                           )

and                                 )
                                           )

ELIZABETH REIGART           )
                                           )

                  Plaintiffs,      )
                                           )

                   v.         )
                                         )

**KINDRED HEALTHCARE, INC.**     )

3

| | |
|---|---|
| **D/B/A REHABCARE** | ) |
| <u>Serve</u>: | ) |
| The Corporation Trust Company | ) |
| Corporation Trust Center | ) |
| 1209 Orange Street | ) |
| Wilmington, DE 19801 | ) |
| | ) |
| Defendant. | ) |

---

## <u>AMENDED COMPLAINT</u>
### (False Claims Act)

## I.    <u>INTRODUCTION</u>

1.    Elizabeth Reigart brings this action on behalf of the United States and the States of California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington, as well as the Commonwealths of Massachusetts and Virginia against Kindred Healthcare, Inc. ("Kindred") D/B/A RehabCare to recover tens of millions of dollars in false billing for rehabilitation services that were *not* provided to Medicare, Medicaid, and TRICARE patients (or "beneficiaries") at skilled nursing facilities ("SNFs").  Thousands of times, between October 2011 and the present, RehabCare knowingly failed to inform SNFs of changes of therapy ("COTs") where fewer rehabilitation services (or none at all) were provided to beneficiaries, resulting in false bills to the Center for Medicare and Medicaid Services ("CMS"), the U.S. Department of Defense ("DoD") and the Medicaid programs administered by the foregoing states.  Relator warned her chain of command at RehabCare multiple times about the systemic failures to inform the company's client SNFs about COTs and the subsequent overbilling of client SNFs and government programs.  RehabCare

ignored these warnings.  This fraud scheme violated the Federal False Claims Act ("FCA") and the False Claims Acts of the various states.

2.  Concerned that providers were overbilling CMS for reductions in therapy provided to beneficiaries, CMS instituted new COT rules in October 2011 requiring providers to assess and report changes of therapy-levels, so that their bills to CMS *accurately* reflect the volume of services *actually* provided to the beneficiary.  *See* 74 Fed. Reg 48486 (Aug. 8, 2011).  Since October 2011, Rehabcare has knowingly and systematically violated these rules, ignored multiple warnings from Relator about these violations, submitted false and inflated bills to its client SNFs for services that were not rendered, and caused the client SNFs to submit false and inflated bills to CMS.

3.  From at least October 1, 2011 through the present, RehabCare has developed, maintained and used a computer system called SMART for its employees to track the care rendered to its patients, including but not limited to when a COT is required.  RehabCare also generates invoices to its client SNFs from SMART, based on the data logged within SMART.

4.  Between October 1, 2011 and the present, RehabCare has knowingly, falsely, and fraudulently failed to record in the SMART system material COTs at least 25,265 times out of the 62,361 times when a COT was required.  During this same period of time, RehabCare failed to disclose the need for thousands of these COTs to its client SNFs.

5.  Over 94% percent of the 25,265 COTs not recorded in SMART reflected a *decrease* in the therapy provided to beneficiaries, often resulting in overbilling RehabCare's client SNFs for more therapy than it actually provided to beneficiaries.  Even worse, for 65% of the 25,265 COTs that were not entered into the SMART system, RehabCare provided so little therapy to beneficiaries that it was not entitled to any reimbursement at all.

6.      RehabCare conducted its COT fraud scheme nationwide, affecting 559 SNFs in 42 states.  In Massachusetts alone, it did not enter 2,565 COTs into the SMART system – more than in any other state.

7.      RehabCare's concealment of COTs from its client SNFs resulted in massive fraudulent overbilling of its client SNFs and caused its client SNFs (including but not limited to the ones owned, controlled and operated by Kindred) to submit inflated, false claims (through intermediaries, *e.g.*, the Medicare Administrative Contractors ("MACs")) to CMS, DoD and the states for tens of millions of dollars for rehabilitation services that were not rendered to beneficiaries.

8.      Relator repeatedly warned RehabCare about this fraudulent scheme; yet, RehabCare, fully aware of Relator's multiple warnings and alerts in SMART, the company's own internal, proprietary software data system, ignored them.  Both RehabCare and Kindred had access to the SMART system, which made it clear that RehabCare was concealing COTs from its client SNFs and thus overbilling them for services not rendered.  Kindred's access to SMART likewise made the Kindred-owned SNFs deliberately indifferent to the same massive reductions in therapy for which they were overbilling the MACs and CMS.

9.      In addition, between 2012 and 2016, RehabCare billed client SNFs for services rendered to at least 9,400 patients for whom RehabCare clinicians failed to develop and maintain the documentation required for those SNFs to be reimbursed by CMS for the services purportedly rendered to those 9,400 beneficiaries.

10.     When Medicare Part A and Part B beneficiaries receive covered physical therapy, occupational therapy, and speech therapy, the provider must develop and maintain certain documentation, including plans of care, certifications and recertification of those plans of care,

treatment notes, G-codes, and progress reports, in order to "justify the services billed." CMS, Medicare Benefit Policy Manual, ch. 15 § 220.3(A).  This documentation is necessary to support the medical necessity of therapy provided.  In the event of an audit, the provider must be able to produce this documentation, or their claims for reimbursement can be denied.

11.     The documentation not only serves to justify treatment; it also guides treatment. The plan of care, for example, provides a roadmap for treating the patient.  It discusses the appropriate treatments, the treatments not to be used in light of the patient's condition, and the patient's goals.  Similarly, progress reports document the patient's progress toward meeting goals set in the plan of care and help the therapist evaluate if treatment should be modified in light of that progress (or lack thereof).  Put simply, documentation is required for effective care.

12.     Even though RehabCare was well aware of the need and requirements for documentation, it failed to develop and maintain over 28,000 required documents for over 9,400 patients.

13.     Despite frequent warnings from Relator and others to executives at RehabCare about failures to comply with documentation requirements, RehabCare failed to ensure compliance with those requirements and continued to bill clients knowing that those clients would make false claims for reimbursement for undocumented treatment.

14.     RehabCare's knowing failure to develop and maintain the required documentation for at least 9,400 patients put them at risk by, *inter alia*, leaving clinicians without plans of care and other records to ensure proper care.

15.     RehabCare's knowing failure to develop and maintain the required documentation for at least 9,400 beneficiaries also resulted in false billing to the client SNFs, thereby causing

them to submit false claims to the government for reimbursement, as the development and retention of such documentation is required for lawful reimbursement.

## II.   <u>TABLE OF ABBREVIATIONS</u>

16.    The following abbreviations appear in this Complaint:

| TABLE 1: ABBREVIATIONS | |
| --- | --- |
| **Abbreviation** | **Meaning** |
| AI | Assessment Indicator |
| ARD | Assessment Reference Date |
| CAA | Care Area Assessment |
| CMS | Center for Medicare and Medicaid Services |
| COT | Change of Therapy |
| DOD | Department of Defense |
| FCA | False Claims Act |
| HHS | Health and Human Services |
| MAC | Medicare Administrative Contractor |
| MDS | Minimum Data Set |
| PPS | Prospective Payment System |
| QIES | Quality Improvement and Evaluation System |
| QMB | Qualified Medicare Beneficiary |
| RAI | Resident Assessment Instrument |
| RH | Rehab High |
| RL | Rehab Low |
| RM | Rehab Medium |
| RU | Rehab Ultra High |
| RUG | Rehabilitation Utilization Group |
| RV | Rehab Very High |
| SNF | Skilled Nursing Facility |

## III.   <u>JURISDICTION AND VENUE</u>

17.    This Court has jurisdiction over Counts I through IV for violations of the federal False Claims Act under 31 U.S.C. § 3730 and 28 U.S.C. § 1331.

18.    This Court has jurisdiction over Counts V through LII for violations of various state False Claims Acts pursuant to 31 U.S.C. § 3732(b), because the violations are from the

same transactions or occurrences that are the subject of the federal False Claims Act claims alleged in Counts I through IV.  This Court also has supplemental jurisdiction over Counts V through LII under 28 U.S.C. § 1367, because Count V through LII and Counts I through IV form part of the same case or controversy.

19.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a) as a place where the defendant can be found and transacts business.

20.     The allegations and transactions set forth in this Amended Complaint have not been publicly disclosed through any of the means enumerated in 31 U.S.C. § 3730(e)(4)(A).

21.     Relator has direct knowledge of the matters alleged herein, derived through her employment with Defendant, and her knowledge is independent from any allegations or transactions that may have been publicly disclosed through any of the means enumerated in 31 U.S.C. § 3730(e)(4)(A).

22.     Prior to filing this Amended Complaint, Relator voluntarily provided the information set forth herein to the Government.

## IV.    <u>PARTIES</u>

23.     Plaintiff the United States of America is acting on behalf of (a) the U.S. Department of Health and Human Services ("HHS") and CMS, which administers the Medicare program, and (b) the DoD, including its component, the Defense Health Agency, which administers the TRICARE Program.

24.     Plaintiffs the States of California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and

Washington as well as the Commonwealths of Massachusetts and Virginia all participate in the federal Medicaid program, under which health care providers may be paid with state funds for providing, *inter alia*, rehabilitation therapy in SNFs.

25.     Relator Elizabeth Reigart was a Clinical Performance Specialist for RehabCare between 2003 and March 2016.   At the time she resigned from the company, Ms. Reigart supported its operations within the company's "Northeast" and "Midwest" regions, covering a total of 212 facilities in 19 states.

26.     Defendant Kindred Healthcare, Inc. is the largest diversified provider of post-acute care services in the United States.   It is incorporated in Delaware with its principal place of business in Louisville, Kentucky and operations throughout the United States, including in the District of Massachusetts.   As of June 30, 2015, Kindred through its subsidiaries had approximately 103,700 employees providing healthcare services in 2,730 locations in 47 states, including 96 transitional care hospitals, 16 inpatient rehabilitation hospitals, 90 nursing centers, 21 sub-acute units, 656 home health, hospice and non-medical home care sites of service, and 99 inpatient        rehabilitation        units        (hospital-based).        *See        About        Kindred*, http://www.kindredhealthcare.com/our-company/company-overview/ (last visited Oct. 28, 2015). On June 1, 2011, Kindred Healthcare, Inc. acquired RehabCare Group, Inc., a contract rehabilitation services business which currently operates as "RehabCare" in 47 states.   RehabCare provides contract therapy services to over 1,500 facilities across multiple settings including SNFs operated by both Kindred Healthcare, Inc. and by third parties.   In the six months ending on June 30, 2015, RehabCare generated over $489,000 million in revenue.   *See* Kindred Healthcare, Inc., Quarterly Report (Form 10-Q) at 53 (Aug. 18, 2015).

27.    Between October 2011 and the present, Kindred owned, controlled and operated at least 79 of RehabCare's client SNFs, including: Kindred At Home - Emeritus Of Prospect Heights; Kindred At Home - Las Vegas; Kindred At Home Lincolnwood; Kindred At Home Garden Grove; Kindred At Home San Bernardino; Kindred At Home San Diego; Kindred At Home Torrance; Kindred At Home-Chicago; Kindred Chicago North Hospital; Kindred Hcc Orange (Cl 9/30/09); Kindred Hospital Dayton; Kindred Hospital North Shore; Kindred Lakeshore Chicago; Kindred Nursing and Rehabilitation-Colony House; Kindred Nursing and Rehabilitation-Laurel Ridge; Kindred Nursing and Rehabilitation-Lincoln; Kindred Nursing and Rehabilitation-Madison; Kindred Nursing and Rehabilitation-Newton & Wellesley; Kindred Nursing and Rehabilitation Presentation; Kindred Nursing and Rehabilitation-Zebulon; Kindred Nursing And Rehabilitation - Fifth Avenue; Kindred Nursing And Rehabilitation - Danville; Kindred Nursing And Rehabilitation - Riverside; Kindred Nursing And Rehabilitation - Andrew House; Kindred Nursing And Rehabilitation - Hillcrest; Kindred Nursing And Rehabilitation - Oakwood; Kindred Nursing And Rehabilitation - Rawlins; Kindred Nursing And Rehabilitation - River Terrace; Kindred Nursing And Rehabilitation - St. George; Kindred Nursing And Rehabilitation - Sunnyside; Kindred Nursing And Rehabilitation - Wasatch Care; Kindred Nursing And Rehabilitation - Westgate; Kindred Nursing And Rehabilitation - Wind River; Kindred TCR - Boise 1506; Kindred TCR - Brighton; Kindred TCR – Cherry Hills; Kindred TCR - Federal Heights; Kindred TCR - Malley; Kindred TCR - Torrey Pines; Kindred TCR Blueberry Hill; Kindred TCR Tucson; Kindred TCR-Abercorn; Kindred TCR-Augusta; Kindred TCR-Bay View; Kindred TCR-Beacon Hill; Kindred TCR-Big Springs; Kindred TCR-Brewer; Kindred TCR-Cheyenne; Kindred TCR-Cypress Pointe; Kindred TCR-Dover; Kindred TCR-Eliot;

Kindred TCR-Fountain Circle; Kindred TCR Hammersmith; Kindred TCR-Kachina; Kindred TCR-Kennebunk; Kindred TCR-Mariett A; Kindred TCR Marlborough; Kindred TCR-Milwaukee; Kindred TCR-Monroe; Kindred TCR Newburyport; Kindred TCR-Northfield; Kindred TCR-Northwest; Kindred TCR-Pettigrew; Kindred TCR-Primacy; Kindred TCR-Queen Anne; Kindred TCR-Rainier; Kindred TCR-Raleigh; Kindred TCR-Rocky Mount; Kindred TCR-Sachem; Kindred TCR-Silas Creek; Kindred TCR-Sunnybrook; Kindred Transitional Care And Rehabilitation - Kennedy Park; Kindred Transitional Care And Rehabilitation - Las Vegas; Kindred Transitional Care And Rehabilitation Crosslands; Kindred Transitional Care And Rehabilitation Mobile; Kindred Transitional Care And Rehabilitation Muncie; Kindred Transitional Care And Rehabilitation Parkwood; Kindred Transitional Care And Rehabilitation Vallhaven; and RSH Kindred Nursing & Rehabilitation – Goddard.

## V.   MEDICARE PART A

### A.   MEDICARE PART A COVERAGE OF SNF REHABILITATION THERAPY

28.   Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A.

29.   The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

30.   Subject to certain conditions, Medicare Part A covers a portion of up to 100 days of skilled nursing and rehabilitation care for a benefit period following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §

409.61(b)-(c).  For beneficiaries who qualify, Medicare Part A will reimburse providers for the costs of, among others, skilled nursing services, skilled rehabilitation services, medical social services, drugs/biologicals, durable medical equipment, and bed and board when receiving such services.

31.    SNFs provide skilled nursing and rehabilitation care eligible for Part A reimbursement.   In 2013, 94% of SNFs were freestanding, and the rest were located within hospitals. *See* Scott R. Talaga, Congressional Research Service, Medicare Skilled Nursing Facility Primer: Benefit Basics and Issues 4 (2014). Additionally, in 2012, 70% of SNFs were for-profit facilities, 25% of SNFs were non-profit facilities, and the others were government-owned facilities. *Id.*

32.    SNFs provide services to Medicare beneficiaries ailing from a number of different diseases and conditions. Some of the more frequent hospital conditions of patients referred to SNFs for post-acute care are joint replacement, septicemia, kidney and urinary tract infections, hip and femur procedures not related to joint replacement, pneumonia, and heart failure.

33.    To be considered *skilled* a service must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapy, occupational therapy, or speech pathology.  *See* 42 C.F.R. § 409.3l(a).  Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitive exercises (*e.g.,* exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d).

34.     Medicare Part A coverage of skilled rehabilitation therapy requires, among other conditions: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a SNF on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a SNF (for a condition treated during the hospital stay). *See* 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

35.     Medicare Part A will only cover those services that are reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(l)(A); *see also* 42 U.S.C. § 1320c-5(a)(l) (providers must assure that they provide services economically and only when, and to the extent, medically necessary); 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).

**B.     MEDICARE PART A PAYMENT FOR SNF REHABILITATION THERAPY**

36.     Under its prospective payment system ("PPS"), CMS pays a SNF a pre-determined daily rate for each day of covered skilled nursing and rehabilitation services provided by the SNF (or its contractor) to a Medicare Part A beneficiary. Coinsurance for this Medicare coverage is paid by Medicaid and TRICARE for qualifying beneficiaries.

37.     The daily rate is determined by the intensity of nursing services provided to a beneficiary; the intensity of therapy services provided; the cost of other "non-case mix" items such as room, board, linens, and administrative services; the location of the SNF in an urban or rural

setting; and regional adjustments for the relative cost of labor.  *See* CMS, Medicare Claims Processing Manual, ch. 6 at § 30.4.2 (2015).

38.     The nursing and rehabilitation components of the daily rate are determined by classifying each beneficiary into a resource utilization group ("RUG").  Each distinct RUG is intended to reflect the costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs. Since the introduction of the "RUG-IV" classification system on October 10, 2010, there have been 66 RUGs.

39.      Certain RUGs are only for nursing services ("nonrehabilitation RUGs").  Other RUGs are for nursing and rehabilitation services combined ("rehabilitation RUGs").   The rehabilitation RUGs are most relevant to this case.

40.     Rehabilitation RUGs include both rehabilitation and nursing components.  The rehabilitation component of a rehabilitation RUG is categorized as one of the following five levels of service: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

### i.     *Rehabilitation Component of the Rehabilitation RUG-Level*

41.     The RUG level to which a patient is assigned for purposes of rehabilitation is determined through the application of a formula and is a function of the number of skilled therapy minutes, the number of therapy disciplines, and the number of therapy sessions the patient received during a seven-day assessment period (known as the "lookback period").

42.     Table 2 below reflects the requirements for the five rehabilitation RUG levels under the RUG-IV classification system.

| TABLE 2: RUG LEVELS | |
| :---: | :---: |
| **Rehabilitation RUG Level** | **Strict Requirements for RUG Level (in the prior seven (7) days)** |
| RU = Ultra High | • Minimum 720 minutes total therapy combined from at least two (2) therapy disciplines;<br>• One therapy discipline must be provided at least five (5) days of the prior seven (7) days;<br>• A second therapy discipline must be provided for at least three (3) of the prior seven (7) days |
| RV = Very High | • Minimum 500 minutes;<br>• One therapy discipline must be provided at least five (5) days of the prior seven (7) days |
| RH = High | • Minimum 325 minutes;<br>• One therapy discipline must be provided at least five (5) days of the prior seven (7) days |
| RM = Medium | • Minimum 150 minutes;<br>• Must be provided at least five (5) days of the prior seven (7) days, but can be any mix of therapy disciplines |
| RL = Low | • Minimum 45 minutes;<br>• Must be provided at least three (3) days of the prior seven (7) days, but can be any mix of therapy disciplines |

43.    CMS pays the highest daily rate for those beneficiaries that fall into the Ultra High ("RU") rehabilitation RUG level, the second highest daily rate for those in the Very High ("RV") rehabilitation RUG level, and so on.

44.    Within each rehabilitation RUG level, SNF operators receive a set reimbursement amount for that RUG level, regardless of the number of minutes provided, so long as the minutes fall within that rehabilitation RUG-level's designated range of minutes.  For example, CMS (through the MAC) reimburses a SNF at the RV level, so long as it provides a patient with 500 to 719 minutes of a single therapy discipline during five days of a seven-day lookback period.

16

ii.      *Nursing Component of the Rehabilitation RUG-Level*

45.      The nursing component of a rehabilitation RUG-level is determined by an assessment of the patient's capability of performing certain activities of daily living, specifically, bed mobility, transfer (*e.g.*, between bed and chair), toileting, and eating.  Depending on the level of assistance needed with daily activities, a beneficiary who receives rehabilitation services will be classified into one of three nursing levels (A, B, and C), with A requiring the least nursing assistance and C the most.

46.      A beneficiary receiving rehabilitation services will be classified, first, in one of the five rehabilitation levels enumerated above (RU, RV, RH, RM, RL) and, second, in one of three nursing levels (A, B, and C).  Thus, the rehabilitation RUG designations are:

(A)      Ultra High: RUA, RUB, RUC

(B)      Very High: RVA, RVB, RVC

(C)      High: RHA, RHB, RHC

(D)      Medium: RMA, RMB, RMC

(E)      Low: RLA and RLB (There is no RLC RUG.).[1]

47.      The daily rate that CMS pays a SNF for care delivered to a beneficiary in each of these RUGs varies by locality and changes each fiscal year to adjust for inflation, among other factors.  For example, the daily rates in Boston for fiscal year 2015 were as follows:

---

[1]      A patient may also be categorized in a "Rehabilitation with Extensive Services" RUG, if s/he requires tracheostomy care, a ventilator/respirator, and/or infection isolation.  There are two levels of extensive services "X" and "L," that are determined by a patient's need for assistance with daily activities.  Thus, the RUG designations are RUX, RUL, RVX, RVL, RHX, RHL, RMX, RML, and RLX.  There is no RLL.  Since patients who require extensive services are often too sick or frail to endure rehabilitation treatment, patients are more frequently classified in a Rehabilitation category than a Rehabilitation Plus Extensive Services category.

| TABLE 3: 2015 BOSTON RUG REIMBURSEMENT RATES ||
|---|---|
| **RUG** | **Daily Rate** |
| RUC | $698.06 |
| RUB | $698.06 |
| RUA | $583.68 |
| RVC | $598.85 |
| RVB | $518.59 |
| RVA | $516.58 |
| RHC | $521.82 |
| RHB | $496.45 |
| RHA | $413.47 |
| RMC | $458.42 |
| RMB | $430.32 |
| RMA | $354.09 |
| RLB | $445.70 |
| RLA | $287.18 |

## C.   STATEMENTS AND CLAIMS TO MEDICARE PART A FOR REIMBURSEMENT OF SNF REHABILITATION THERAPY

48.     CMS pays for SNF care under Medicare Part A, only if the beneficiary is "correctly assigned to one of the Resource Utilization Groups designated as representing the required level of care."  42 C.F.R. § 424.20(a)(1)(ii).  CMS also requires the SNF to conduct an "accurate . . . assessment of each resident's functional capacity." 42 C.F.R. § 483.20.  Accordingly, CMS requires SNFs periodically to assess each beneficiary's clinical condition, functional status, and expected and actual use of services to determine the proper RUG.  Thus, a beneficiary's RUG

may change periodically during the course of a 100-day Medicare Part A stay.  If the RUG changes, then so too does the corresponding daily rate at which CMS pays the SNF changes.

49.     CMS requires SNFs to conduct scheduled assessments at regular intervals during the Medicare Part A beneficiary's stay.  *See* CMS, Long-Term Care Facility Resident Assessment Instrument User's Manual Version 3.0, ch. 2.8 at 2-40 (2014).  The SNF must assess each beneficiary on or about the 5th, 14th, 30th, 60th, and 90th day of the beneficiary's Medicare Part A stay in the facility. *See id.*, ch. 2.8 at 2-41.  The date on which the SNF performs the assessment is known as the assessment reference date ("ARD").  *See id*., ch. 2.5 at 2-8.

50.     A SNF has a choice of when to set the ARD for a scheduled assessment.  It may set the ARD within a window of time three or four days before or, under certain circumstances, up to four days after the 5th, 14th, 30th, 60th, and 90th day of the Medicare Part A beneficiary's stay.  *See id,.* ch. 2.8 at 2-41 to 2-43.  Such assessments (except for the first assessment) review the beneficiary's therapy for the seven days preceding the ARD (the lookback period).  *See id.*, ch. 2.5 at 2-8.

51.     On the ARD, the SNF must assign a rehabilitation RUG-level to the Medicare Part A beneficiary, based on the information gathered from the lookback period.  *See id*., ch. 6.4 at 6-6 and 6-20.

52.     In most instances, the RUG-level determines the amount of the Medicare Part A reimbursement prospectively for a defined period of time.[2] *See id.,* ch. 6.4 at 6-5.  For example,

---

[2]     Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be  provided through day 14.

if a beneficiary was assessed on Day 14 of his stay, and he received 720 minutes of therapy during Days 7 through 14 of the stay, which would fall into the Ultra High RUG level, then CMS would reimburse the SNF for the beneficiary's care at the Ultra High RUG level until the next ARD (*e.g.,* through Day 30).

53.     SNFs must report the results of their assessments to CMS using a standardized tool known as the Minimum Data Set ("MDS").[3] *See id.*, ch. 2.7 at 2-39.  For all assessments, except the admission assessment, no later than 14 days after the assessment date, the MDS must be completed and transmitted to CMS' Quality Improvement and Evaluation System ("QIES"). *See id.,* ch. 2.9 at 2-46.

54.     The MDS includes clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section O of the MDS ("Special Treatments, Procedures, and Programs") includes information on how much and what kind of skilled rehabilitation therapy the SNF provided to a beneficiary during the look-back period.  In particular, Section O shows the number of days and minutes of therapy that a SNF provided to a beneficiary in each therapy discipline (*i.e.*, physical therapy, occupational therapy, and speech-language pathology and audiology services).

55.     Completion of the MDS is a prerequisite to payment under Medicare Part A, as Section Z of the MDS (Signature of Persons Completing the Assessment or Entry/Death Reporting) requires the following certification:

---

[3]     The MDS is one of three parts of the Resident Assessment Instrument ("RAI"), which must be completed for all residents in Medicare- and Medicaid-certified nursing homes. The additional two parts are the Care Area Assessment "(CAA") and RAI Utilization Guidelines."

I certify that the accompanying information accurately reflects resident assessment information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility on its behalf.

56.     A SNF submits a claim for Medicare Part A reimbursement by sending the MAC either an electronic claim or a paper claim (when permissible in limited circumstances).  Each Medicare Part A claim contains a Health Insurance Prospective Payment System ("HIPPS") code, which CMS uses to determine the payment amount owed to the SNF for that particular claim. The HIPPS code consists of the RUG-IV code and the Assessment Indicator ("AI"), which indicates the assessment type (*e.g.,* COT, 30-Day, etc.).  Thus, the claim and the corresponding payment to the SNF is determined, in part, by the rehabilitation RUG level.  (It is also determined by the geographic location of the SNF and whether the SNF is located in an urban or rural area.).

57.     The SNF is responsible for consolidated billing for Medicare Part A reimbursable services.  If a patient receives rehabilitation services from a third party provider, the SNF must bill Medicare Part A and then reimburse the third party for its services at a rate agreed upon between the SNF and the third party. *See* CMS, Medicare Claims Processing Manual, ch. 6 at § 10.1 and 80.5 (2015).

### D.     CHANGE OF THERAPY ("COT")

58.     The SNF also is required to complete an MDS for unscheduled assessments, including but not limited to the COT. *See* CMS, Long-Term Care Facility Resident Assessment

21

Instrument User's Manual Version 3.0, ch. 2.8 at 2-42 (2014).   Unscheduled assessments are driven by clinical events that occur during the Medicare Part A beneficiary's stay.   Other unscheduled assessments include:   the Significant Change in Status Assessment, Significant Correction to Prior Comprehensive Assessment, Start of Therapy Other Medicare Required Assessment, and End of Therapy Other Medicare Required Assessment.

59.   On October 1, 2011, CMS required SNFs – going forward – to execute a COT, when in the prior seven days a patient's RUG had changed, due to a sufficient increase or decrease in the number of reimbursable therapy minutes, therapy days, and/or therapy disciplines since the last assessment.   *See* CMS, Long-Term Care Facility Resident Assessment Instrument User's Manual Version 3.0, ch. 2.9 at 2-51 (2014).   For example:   Assume that on Day 30, a SNF patient was classified into RU because the Day 30-ARD indicated that he had received a minimum of 720 minutes of therapy.   Between Day 30 and Day 37, however, he received only 515 minutes of therapy, thereby constituting a change in the resident's therapy RUG to the next lowest level, *i.e.*, RV.   When such a change in therapy has occurred, the SNF is required to notify the MAC of the change. *See* CMS, Long-Term Care Facility Resident Assessment Instrument User's Manual Version 3.0, ch. 2.9 (2014).

60.   Every seven days, the SNF is required to conduct an "informal assessment" to determine whether a COT is necessary. CMS, Long-Term Care Facility Resident Assessment Instrument User's Manual Version 3.0, ch. 2.9 (2014).   The seven-day period begins the day after the most recent scheduled or unscheduled assessment. *Id.*   The assessment is "informal" because it functions merely to inform the SNF whether a COT is needed, and no paperwork or electronic information need be conveyed to CMS.   If the informal assessment reveals a need for a COT, then an ARD should be set for Day 7 of the COT lookback period. *Id.*

22

61.     CMS requires the SNF to set a date for (or "lock") the ARD of a COT within 48 hours of Day 7 of the COT lookback period (*i.e.*, by the end of Day 9). *See id.*, ch. 2.9 at 2-55.  Once in place, the lock is set in the SNF's software and automatically transmitted to the MAC, alerting the MAC that the SNF should be filing an MDS identifying the details of the COT within 14 days of the COT ARD. CMS, Long-Term Care Facility Resident Assessment Instrument User's Manual Version 3.0, ch. 2.9 at 2-54 (2014).

62.     The COT requirement continues throughout the Medicare Part A beneficiary's stay at the SNF.  Thus, a COT informal assessment occurs on every seventh day following a scheduled or unscheduled PPS assessment, and, if a COT is required, the SNF must lock the COT ARD for the same date.[4]  For example, if the ARD for the scheduled 30-Day PPS assessment was set for Day 30, then the seven-day COT lookback period would begin on Day 31.  Seven days later, on Day 37, the reimbursable therapy minutes and the number of therapy disciplines for the therapy provided to the beneficiary on Days 31-37 (*i.e.*, the seven-day lookback period) must be informally assessed to determine whether the beneficiary's care should remain in the same RUG that had been assigned on the 30-day PPS assessment.  If the RUG has changed, then the MDS indicating a COT must be completed using the ARD of Day 37.  If, however, the therapy provided in the seven-day lookback window on Day 37 did not require a change in RUG-level, then there would be no COT, a COT ARD need not be set, and a COT MDS need not be completed.  Whether or not there is a COT on Day 37, the next COT lookback period would begin again on Day 38.  The therapy provided between Days 38 and 44 must be informally assessed to determine whether the therapy provided in this second seven-day lookback period would require a change in the RUG-level from what was assigned on the prior assessment.  Another lookback

---

[4]     The exception is when an End of Therapy with Resumption OMRA is completed. In this case, the first day of the COT lookback period is the date that therapy resumed.

period would begin on Day 45 and so on, until the next scheduled or unscheduled ARD.  If, for example, the next ARD was the 60-Day ARD, the COT clock would reset and the first day of the seven-day COT lookback period would be Day 61.

63.     Typically, the new RUG established in the COT will be effective for determining the Medicare Part A reimbursement rate for the entire seven-day COT lookback period, beginning on the day following the last scheduled or unscheduled assessment and ending on the date of the locked COT ARD.  Further, the RUG set on that same COT ARD will control reimbursement until the next scheduled or unscheduled assessment.  Thus, when the SNF reports to the MAC a COT that shows a decrease in the RUG level, the MAC, in turn, will reimburse the SNF at a lower rate for the seven-day lookback period as well as any period following the COT until the next assessment or until the beneficiary is discharged from the SNF.  For example, assume the ARD for the scheduled 30-Day PPS assessment was set for Day 30, and the RUG was set to Ultra High.  The RUG remained at Ultra High until Day 58, when an informal assessment showed that the RUG had dropped to Medium.  Accordingly, the SNF set a COT ARD for Day 58 and reported the COT ARD to the MAC.  On Day 60, the SNF conducted a 60-Day assessment that showed that the RUG had returned to Ultra High effective on Day 61 (*i.e.,* the day after the scheduled assessment).  The SNF had to bill the MAC at the Medium level for Days 52-58 (*i.e.,* the seven-day lookback period) and Days 59 and 60, the two days before the 60-day assessment took effect.

64.     **Missed COT ARD.**  If the SNF failed to set the ARD for a COT when one was required, and no COT ARD was ever set during the beneficiary's 100-day Medicare Part A stay, then the COT was "missed," and the SNF is not entitled to be reimbursed *at all* for any of the days controlled by the missed COT.  *See* CMS, Long-Term Care Facility Resident Assessment Instrument User's

Manual Version 3.0, ch. 6.8 at 6-56 (2014).   For example, assume a 30-day assessment was performed

on Day 30 setting the RUG at Ultra High.  Based on the informal assessment on Day 37, the RUG had

fallen to Medium, indicating a need for a COT.  A COT ARD should have been set for Day 37, but it

was not.  The patient was discharged on Day 43.  In this scenario, the SNF is not entitled to *any*

reimbursement from CMS for Days 31-43, i.e., the days when the missed COTs would have controlled.

If, in that case, the SNF were to bill CMS for Days 31-60, then such a claim would be false.

## VI.    MEDICARE PART B

65.    Medicare Part B, sometimes referred to as the supplementary medical insurance

program, generally covers medical services that occur outside the hospital setting.  This coverage

includes, among other things, preventative doctor visits, lab tests, and "outpatient" therapy

treatments. *See* 42 U.S.C. § 1395k.  While these services are considered outpatient, they include

services furnished by participating hospitals and SNFs to their inpatients who have exhausted Part

A inpatient benefits or who are otherwise not eligible for Part A benefits.  *See* CMS, Medicare

Benefit Policy Manual, Ch. 15 at § 220.1.4 (2016).

66.    CMS usually reimburses providers for 80 percent of the reasonable and customary

fee for the services provided under Medicare Part B.  The patient and/or the patient's private

insurance carrier typically cover the remaining 20 percent of the cost of medical services. *See*

CMS, Medicare General Information, Eligibility, and Payment Limitations Ch. 3 § 20.3 (2015);

42 U.S.C. § 1395m(k) (for outpatient therapy services).

67.    For beneficiaries receiving services at a SNF, the SNF is responsible for submitting

claims for reimbursement to CMS for covered services rendered to the Medicare beneficiaries.

The SNFs submit these claims either on a monthly basis or at the conclusion of the beneficiary's

treatment. *See* CMS, Medicare Claims Processing Manual Ch. 7 § 30.1 (2015).

68.     To receive reimbursement from CMS, the SNF must submit a claim on a form known as a CMS-1450 (also referred to as the UB-04, Uniform Institutional Provider Bill) or online through its electronic equivalent, Form 837I (also referred to as ASC X12 837). *See* 42 C.F.R. § 424.32; CMS, Medicare Claims Processing Manual Ch. 7 § 30.

69.     SNFs must submit Part B claims for the majority of services provided to beneficiaries, including rehabilitation therapy, through "consolidated billing." *See* Pub.L. 105–33 § 4432 (b) (Balanced Budget Act of 1997).  Under this system, the SNF submits a single claim for the entire package of care that beneficiaries receive during the applicable time period at the SNF, including all physical, occupational, and speech therapy services rendered.

70.     Unlike billing under Medicare Part A, however, the RUG system is not used for billing under Medicare Part B.  Instead, the claim must state the medical service rendered by the provider, indicated by an alphanumeric billing code. 42 U.S.C. § 1395yy(e)(10); 42 C.F.R. § 424.32(A)(1).  These codes are found within the Healthcare Common Procedure Coding System ("HCPCS") and are known as HCPCS codes.  Each HCPCS code corresponds to a particular therapeutic service.  For example, the HCPCS code for therapeutic exercises to develop strength and endurance, range of motion, and flexibility is 97110.  Each HCPCS code is assigned an allowable charge on a state-by-state basis.  The allowable charges are published in a fee schedule. *See generally* CMS Medicare Claims Processing Manual Ch. 23.

71.     Reimbursement for most skilled therapy services is connected to the amount of time spent by the clinician on the service.  A "unit" of service is one 15-minute increment.  *See* Medicare Claims Processing Manual Ch. 5 § 20.2(C) (2015).  Thus, one unit of therapeutic exercise (HCPCS code 97110) equals 15-minutes of that exercise.  Two units equal 30-minutes, and so on.

72.     Some services, however, such as the initial evaluation, are "untimed" and, therefore, reimbursed at a set rate regardless of the amount of time spent on the service by the clinician.  *See* Medicare Claims Processing Manual Ch. 5 § 20.2(B) (2015).

73.     In general, CMS will reimburse SNFs for applicable medical services rendered to qualified beneficiaries, so long as, *inter alia*, those services are medically necessary. *See* 42 C.F.R. § 424.5.  Skilled therapy at a SNF is deemed medically necessary if the treatment will reasonably improve the patient's current condition, maintain the patient's current condition, or to prevent or slow further deterioration of the patient's condition. CMS, Medicare Benefit Policy Manual, Ch. 8 § 30.4 (2015).

74.     SNFs provide skilled outpatient therapy to Medicare Part B beneficiaries in order to restore a patient's lost mobility and functioning following a wide variety of different diseases and conditions.  Some frequent ailments may include a prolonged bed-bound period, surgery, or heart failure. *See* CMS, Medicare Benefit Policy Manual Ch. 8 § 30.4.1 (2015).

75.     Medicare Part B reimbursements for outpatient skilled therapy are subject to a financial limit. *See* 42 C.F.R. §§ 410.59 and 410.60; CMS Medicare Claims Processing Manual Ch. 5 § 10.2.  In 2016, Part B limited reimbursement for occupational therapy to $1,960 per year and the aggregate of physical and speech therapy to $1,960 per year. CMS, Limits on Therapy Services, publication 10988.  However, this limit may be waived, if the treating therapist documents that further therapy services are medically reasonable and necessary. *Id*.

VII.    **MEDICARE ADVANTAGE PLANS**

76.     Medicare beneficiaries have the option of coverage under Medicare Advantage (*i.e.*, Medicare Health Maintenance Organization) plans, in lieu of traditional coverage under Medicare Parts

A and B.  These Medicare Advantage plans are required to provide beneficiaries with all of the basic benefits that would be available under Parts A and B.  *See* CMS, Medicare Managed Care Manual, ch. 4 at §§ 10.2 and 10.9 (2007).

77.     Thus, a material term of the contracts between CMS and the Medicare Advantage plans is that the plans must provide all Medicare covered benefits.  *See id.* ch. 11 at § 100.1.  As discussed above, Medicare Part A covered benefits include 100 days of SNF care, including rehabilitation therapy, and Medicare Part B covered benefits typically include 80% of the cost of covered rehabilitation therapy.

78.     Certain contracts between SNFs and Medicare Advantage managed care organizations condition reimbursement of SNF rehabilitation services on the same RUG system used under Medicare Part A.  The higher the RUG, the higher the reimbursement for rehabilitation services.  Under these contracts, as with Medicare Part A, SNFs submit MDS's to the Medicare Advantage managed care organizations to set the RUG and submit COTs when required.  Thus, a missed COT results in an artificially high reimbursement of the SNF.

79.     Similarly, contracts between SNFs and Medicare Advantage managed care organizations require SNFs to maintain the documentation necessary to support the conclusion that treatment is reasonable and necessary.  CMS, Medicare Managed Care Manual, ch. 11 at §§ 10 & 100.2 (requiring contracts to provide for payment of 95% of "clean claims" within thirty days and defining "clean claims" to include "the substantiating documentation needed to meet the requirements for encounter data").

## VIII. **MEDICAID**

80.     Title XIX of the Social Security Act ("the Medicaid Act") authorizes federal grants to the states for Medicaid programs to provide medical assistance to persons with limited income and resources.  States administer Medicaid programs in accordance with federal regulations.  State Medicaid agencies conduct their programs according to a Medicaid state plan approved by CMS. To carry out the mandates of the Medicaid program, the state agency pays providers for medical care and services provided to eligible Medicaid recipients.

81.     Although various states administer Medicaid programs, federal and state governments jointly finance them.  The federal government pays its share of medical assistance expenditures to the state on a quarterly basis according to statements of expenditures submitted by the state and a formula described in sections 1903 and 1904(b) of the Medicaid Act.  The state pays its share of medical assistance expenditures from state and local government funds in accordance with section 1902(a)(2) of the Medicaid Act.

82.     For patients eligible for both Medicare and Medicaid ("dual-eligible beneficiaries"), Medicaid is the payer of last resort and covers many costs not covered by Medicare, including, for many Medicaid beneficiaries, coinsurance for rehabilitation services provided to Medicare Parts A and B beneficiaries.

83.     For the first 20 days of a patient's 100-day Medicare Part A stay in a SNF, CMS reimburses the SNF for all covered Medicare Part A services.  *See* 42 C.F.R. § 409.61.  For the 21st through the 100th day, CMS reimburses the SNF for all Medicare Part A covered services, except for a daily coinsurance amount that is the beneficiary's responsibility.  *See id.*  However, Medicaid reimburses the provider for the beneficiary's coinsurance amount for most dual-eligible beneficiaries,

including those with lowest income and least resources (*i.e.,* those in the Qualified Medicare Beneficiary (QMB) and QMB Plus programs).

84.     The SNF bills CMS for any coinsurance during Days 21 through 100 of a dual-eligible beneficiary's stay.

85.     If a SNF bills Medicaid for days controlled by a missed COT (dates that should not be billed because the provider is liable), then it has made a false claim to both the federal government and the state administering the program, since both fund a portion of Medicaid.

86.     In addition, Medicaid covers coinsurance for rehabilitation services rendered to certain Medicare Part B beneficiaries.  The coinsurance is typically 20% of the fee for service.  Thus, a SNF bills Medicaid for 20% of the cost of rehabilitation services rendered to certain dual-eligible beneficiaries.

## IX.    <u>TRICARE</u>

87.     TRICARE (formerly CHAMPUS) is a federally funded medical benefit program established by statute. 10 U.S.C. §§ 1071-1110.  TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired servicemembers, and their dependents.

88.     TRICARE covers the same skilled nursing services that are covered by Medicare. The regulatory authority implementing the TRICARE program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies. 10 U.S.C. § 1079(j)(2) (institutional providers).

89.     TRICARE follows Medicare's PPS, RUG methodology and assessment schedule, and TRICARE beneficiaries are assessed using the same MDS form used by CMS

for Medicare.  *See* TRICARE Reimbursement Manual 6010.58M, ch. 8, § 2, 4.3.5 – 4.3.7,

4.4.3 (2002).

90.     Certain   Medicare   beneficiaries   are   still   eligible   for   TRICARE

("TRICARE/Medicare dual-eligible beneficiaries").   As with Medicaid/Medicare dual-eligible

beneficiaries,   TRICARE   is   the   secondary   payor   to   Medicare   and   is   responsible   for

reimbursing SNFs for amounts that are not covered by Medicare. *See id.*, ch. 4, § 4(I)(C)(1)(a)

& ch. 8 at 4.4.1.  For Days 1 through 20 of a 100-day SNF stay, Medicare Part A covers 100% of

the covered services provided to these dual-eligible beneficiaries.   For days 21 to 100, a SNF is

eligible for reimbursement under Medicare Part A for covered services, except for the coinsurance

amount, which TRICARE covers. *See id.*, ch. 8 at 4.4.2.

91.     The SNF bills the Department of Defense ("DOD") for any cost-share during Days 21

through 100 of a TRICARE/Medicare dual-eligible beneficiary's stay.  If a SNF bills DOD for days

controlled by a missed COT (dates that should not be billed because the provider is liable), then the

SNF has made a false claim.

92.     Similarly, the SNF bills DOD for reimbursement of any cost-share associated with Part

B coverage of rehabilitation therapy.

## X.      REHABCARE'S SYSTEM FOR TRACKING AND SUBMITTING DATA TO SKILLED NURSING FACILITIES

93.     RehabCare uses a proprietary software package called SMART, designed by a

software provider named Casamba, to track the care minutes, dates of therapy, and therapy type

provided by their therapists, occupational therapy assistants, and physical therapy assistants

(collectively "clinicians").  Clinicians log data on tablet computers, which feed the information into the SMART database.

94.     For each scheduled and unscheduled assessment, RehabCare selects the ARD.  For example, for the 30-Day scheduled assessment, RehabCare may set the ARD in SMART between Days 27 and 33 (including grace days).  Typically, RehabCare confers with a SNF representative, usually the SNF's MDS Coordinator, to decide which ARD will maximize revenue (*e.g.*, if the seven-day lookback period for a later ARD produces a higher RUG than an earlier date, the later date will likely be chosen).

95.     RehabCare is responsible for setting COT ARDs in SMART.  By reviewing the therapy entered into the system for the seven-day lookback period, SMART automatically conducts an informal assessment to determine if a COT ARD must be set.  If one is needed, SMART alerts RehabCare by displaying in bright yellow (on SMART's planner view) the RUG on Day 7 of the lookback period.  The bright yellow alert remains in SMART, until RehabCare sets the required COT ARD.  In addition, COT alerts appear in the lower right corner of the SMART resident screen signaling the need to set the COT ARD.  These COT alerts remain until RehabCare sets the COT ARD.  If RehabCare never sets the COT ARD, then the bright yellow COT alert in the planner view and the alert in the lower right corner of the resident screen will remain for that beneficiary.

96.     To set the COT ARD, RehabCare need only click "Set ARD" in the SMART planner view.  Unlike with scheduled assessments, RehabCare has no discretion when it comes to choosing whether to set the COT ARD.  When a COT is required, RehabCare must set the COT ARD on Day 7.  Thus, RehabCare need not consult a SNF representative prior to setting the COT

ARD in SMART.  However, RehabCare must inform the SNF that a COT ARD has been set in the SNF's software.  RehabCare does so by generating an "ARD Report" using SMART and delivering the report to a SNF representative (typically the MDS Coordinator) *via* email or in hard copy.  An ARD Report indicates therapy minutes, days treated, and type of therapy.  RehabCare is responsible for generating COT ARD Reports, for each COT ARD, for each patient, and for transmitting the reports to its client SNFs.

97.    RehabCare must deliver a COT ARD Report to the SNF on the day of the ARD or on the next day, so that the SNF may lock the COT ARD into its system within 48 hours of the ARD. If the SNF never locks the ARD into its system while the beneficiary is a resident, then RehabCare and the SNF are not entitled to be paid at all for the days of therapy controlled by the COT.  If the SNF bills for those days, its claim is false.

## XI.    THE COT FRAUD SCHEME

### A.    REHABCARE SUBMITTED FALSE CLAIMS TO ITS CLIENT SNFs

98.    Since October 2011 when CMS began to require COTs, RehabCare has repeatedly and fraudulently failed to set COT ARDs in SMART and then overbilled its client SNFs.

99.    Between October 1, 2011 and July 30, 2015, RehabCare failed to set a COT ARD in SMART for beneficiaries over 40% of the time the company was required to do so.  Since those beneficiaries have been discharged, RehabCare has "missed" COTs in SMART (*i.e.,* failed to set a required COT in SMART) over 40% of the time a COT was required.

100.   Table 4 below details the total COTs required between October 1, 2011 and July 30, 2015, the number of missed COTs shown in SMART, and the percentage of the total that were missed.

| TABLE 4: COTs MISSED IN SMART | | | |
|---|---|---|---|
| **Fiscal Year** | **Total COTs Required** | **COTs Missed in SMART** | **Percentage Missed** |
| 2012 | 18,994 | 9,849 | 52% |
| 2013 | 22,586 | 8,101 | 36% |
| 2014 | 14,512 | 4,869 | 34% |
| 2015 (through August) | 6,269 | 2,446 | 39% |
| **TOTAL** | 62,361 | **25,265** | **41%** |

101.   At the end of each month, RehabCare sends invoices to its client SNFs for the patients who received therapy during that month.   RehabCare uses SMART to generate the invoices.   Prior to generating an invoice, SMART will generate "alerts" to inform RehabCare of problems with the data entered into the system.   For example, if SMART has alerted RehabCare that the ARD for a scheduled assessment has not been set, then RehabCare must set the ARD before the invoice can be generated.   This is called a "mandatory to clear" alert, informing RehabCare that it must set the ARD (hence, "mandatory") in order to disarm the alert (hence, "clear").

102.   However, the alerts generated by SMART for unset COT ARDs are not "mandatory to clear."   RehabCare has knowingly failed to have SMART programed to make such alerts "mandatory to clear," even after Relator informed superiors at RehabCare numerous times that this change was needed to preserve the integrity of the company's billing.   By failing to make noncompliant COT alerts "mandatory to clear," RehabCare has misled its employees by suggesting that they can ignore the alerts and generate invoices without setting ARDs for the noncompliant COTs.

103.    When RehabCare fails to set a required COT ARD, RehabCare may falsely bill the SNF at the previous RUG for the days controlled by the COT (rather than correctly bill the SNF at the RUG determined by the COT).  For example, when RehabCare fails to set a required COT ARD for a patient who had been receiving therapy at the Rehab Ultra High level, but received less therapy during the seven-day lookback period preceding the COT (*e.g.,* dropping the RUG to the Rehab High Level), RehabCare may continue to bill the SNF falsely at the Ultra High level.

104.    For many of the days controlled by the 25,265 COTs missed in SMART, RehabCare billed its client SNFs at rates corresponding to the RUGs preceding the missed COTs ("billing RUG") as opposed to the RUG corresponding to the intensity of the therapy actually provided ("actual RUG").

105.    For over 94% of the 25,265 COTs missed in SMART, RehabCare should have assigned a lower rehabilitation RUG level in the system based on the decline in minutes of therapy that occurred during the seven-day lookback period; however, RehabCare failed to do so, and, in many cases, continued to bill the SNF falsely for the higher rehabilitation RUG level, as if no change of therapy had occurred.  Thus, over 94% of the time, RehabCare created the potential to widen – and, in many cases, did widen – its profit margin by failing to set a COT ARD in SMART. Table 5 below sets forth the year, total COTs required during that year, the number of COTs

missed in SMART, the number of COTs where the billing RUG exceeded the actual RUG, and the percentage of COTs missed in SMART where the billing RUG exceeded the actual RUG.

| TABLE 5: COTs MISSED IN SMART WHERE RUG DROPPED | | | | |
|---|---|---|---|---|
| Fiscal Year | Total COT | COTs Missed in SMART | # Missed COTs Where RUG Dropped | % Missed COTs Where RUG Dropped |
| 2012 | 18,994 | 9,849 | 9,209 | 94% |
| 2013 | 22,586 | 8,101 | 7,393 | 91% |
| 2014 | 14,512 | 4,869 | 4,836 | 99% |
| 2015 (through August) | 6,269 | 2,446 | 2,195 | 90% |
| **Total** | **62,361** | **25,265** | **23,633** | **94%** |

106. Not only did the RUG drop for 94% of all COTs missed in SMART, but 65% of the time it dropped to a non-rehabilitation RUG, for which RehabCare could not bill anything. As illustrated in Table 6 below, of the 25,265 COTs missed in SMART between October 1, 2011 and August 31, 2015, 16,318 resulted in a drop to a non-rehabilitation RUG. In many of these cases, RehabCare failed to inform its clients of a drop in the RUG to a level where it was not entitled to payment, and then later billed them anyway for services not provided. RehabCare's false billing to its client SNFs caused them, in turn, to submit the same false bills to the government.

| TABLE 6: COTs MISSED IN SMART WHERE RUG DROPPED TO NONREHABILITATION LEVEL | | | | |
|---|---|---|---|---|
| Fiscal Year | Total COT | COTs Missed In SMART | # Missed COTs Where RUG Dropped to Non-Rehabilitation RUG | % of Missed COTs Where RUG Dropped to Non-Rehabilitation |
| 2012 | 18,994 | 9,849 | 5,302 | 54% |
| 2013 | 22,586 | 8,101 | 5,515 | 68% |
| 2014 | 14,512 | 4,869 | 3,619 | 74% |
| 2015 (through August) | 6,269 | 2,446 | 1,882 | 77% |
| Total | 62,361 | 25,265 | 16,318 | 65% |

107.    Regardless of whether the RUG increased or decreased, each time RehabCare invoiced its client SNFs for a RUG that differed from the actual RUG as a result of a COT missed in SMART, it submitted a false claim for payment or approval to a contractor, grantee, or other recipient, for money or property to be spent or used on the Government's behalf or to advance a Government program or interest, when the United States Government had provided a portion of the money or property requested or demanded; or reimbursed such contractor, grantee, or other recipient for a portion of the money or property which was requested or demanded.

## B.    REHABCARE'S FAILURE TO ALERT SNFs TO A CHANGE OF THERAPY CAUSED THE SNFs TO FILE FALSE CLAIMS

108.    For many of the COTs missed in SMART, RehabCare did not alert its client SNFs of the need to set a COT ARD or otherwise advise or direct the client SNFs to set a COT ARD. Accordingly, the SNFs did not set many of the corresponding COT ARDs in their own electronic systems.  Had the SNFs set all of the COTs in their own systems, the systems would have

automatically sent notice of the COTs to the MACs.  Since on many occasions the SNFs did not

set COT ARDs, the SNFs failed to notify the MACs of the COTs.  RehabCare's failure to alert its

client SNFs to the COTs thus caused the client SNFs to miss COTs (*i.e.,* to inform the MACs of

the COTs).

109.    Further, on information and belief, the SNFs failed to file with the MACs'

Minimum Data Sets ("MDSs") (*i.e.*, the standardized tool used to report assessments, including

COT assessments) corresponding to many of the missed COTs.  Without being informed of the

COTs and without the proper MDSs, the MACs did not know the proper RUG for the days

controlled by the missed COTs.

110.    On information and belief, the SNFs billed CMS at the wrong RUG level for many

of the days controlled by the missed COTs.  This often meant billing at fraudulently inflated levels.

Since the MACs were not aware of the proper RUG levels, they were unaware of the false billing.

111.    The SNFs also falsely billed Medicaid and TRICARE, for coinsurance for

corresponding charges for dual-eligible beneficiaries.

112.    By concealing COTs from its client SNFs, RehabCare similarly caused them to fail

to report COTs to Medicare Advantage managed care organizations and to overbill those

organizations for the days controlled by the missed COTs.

113.    RehabCare invoices its client SNFs shortly after the end of each month.  Depending

on the contract between RehabCare and the SNF, the SNF pays RehabCare 30 or 60 days later for

the invoiced amounts.  The SNF sends a claim to the MAC or to the Medicare Advantage managed

care organization about two weeks after receiving the RehabCare invoice.  The MAC or Medicare

Advantage managed care organization remits payment to the SNF approximately two weeks later.

If the SNF disputes a RehabCare invoice, it will make corrections on the invoice and return it to RehabCare.  RehabCare will then use SMART to generate a second, corrected invoice.

114.   Had the SNFs submitted correct claims to the MACs or Medicare Advantage managed care organizations, the SNFs likely would have demanded corrected invoices from RehabCare.  The client SNFs did not note corrections to many of the invoices connected to the 25,265 COTs missed in SMART, and RehabCare did not issue corrected invoices.  Hence, there is evidence to "strengthen the inference of fraud beyond possibility."  *United States ex rel. Duxbury v. Ortho Biotech Prod.*, 579 F.3d 13, 29 (1st Cir. 2009).

115.   By failing to alert its client SNFs of COTs missed in SMART, RehabCare knowingly caused the SNFs to present false or fraudulent claims for payment or approval, that the SNFs had falsely certified as accurate, to officers or employees of the United States Government or to contractors, grantees, or other recipients, when the money or property was to be spent or used on the Government's behalf or to advance a Government program or interest, and when the United States Government provided or had provided any portion of the money or property requested or demanded; or was to reimburse such contractors, grantees, or other recipients for any portion of the money or property requested or demanded.

## C.   KINDRED WAS DELIBERATELY INDIFFERENT TO ITS SNFS' PRESENTMENT OF FALSE CLAIMS TO THE GOVERNMENT

116.   Kindred licensed SMART from Casamba and provided Kindred divisions, including but not limited to RehabCare, access to SMART.

117.   At any time, Kindred could have informed the SNFs owned and operated by Kindred of SMART's contents, including reports on missed COTs, and instructed them to use

SMART to ensure the accuracy of the invoices they were receiving from RehabCare, as well as the invoices they were sending to the MACs for therapy purportedly provided by RehabCare.

118.    On information and belief, Kindred did not do so and, therefore, knowingly failed to ensure compliance with CMS rules and regulations and the FCA.

### D.    THE COT FRAUD SCHEME WAS NATIONWIDE

119.    RehabCare and Kindred conducted their COT fraud scheme nationwide affecting 559 SNFs in 42 states, as set forth in Exhibit A to this Amended Complaint.  Table 7 below indicates the number of COTs missed in SMART in the states indicated.  The highest number of COTs missed in SMART (2,565) was for beneficiaries in SNFs in Massachusetts.

| TABLE 7: STATE DISTRIBUTION OF COTs MISSED IN SMART | | | | | |
|---|---|---|---|---|---|
| STATE | 2012 | 2013 | 2014 | 2015 | TOTAL |
| Alabama | 146 | 24 | 14 | 16 | **200** |
| Arizona | 131 | 41 | 1 | 1 | **174** |
| California | 645 | 167 | 147 | 38 | **997** |
| Colorado | 88 | 571 | 30 | 24 | **713** |
| Connecticut | 154 | 42 | 23 | 5 | **224** |
| Delaware | 12 | 40 | | 17 | **69** |
| Florida | 253 | 211 | 117 | 87 | **668** |
| Georgia | 579 | 838 | 27 | 11 | **1,455** |
| Iowa | 58 | 134 | | | **192** |
| Idaho | 2 | 55 | | | **57** |
| Illinois | 299 | 125 | 186 | 76 | **686** |
| Indiana | 363 | 117 | 95 | | **575** |
| Kansas | 238 | 48 | 91 | 15 | **392** |
| Kentucky | 349 | 143 | 28 | 1 | **521** |
| Massachusetts | 605 | 673 | 1,275 | 12 | **2,565** |

| | | | | | |
|---|---|---|---|---|---|
| Maryland | 162 | 279 | 63 | 349 | **853** |
| Maine | 108 | 727 | 43 | | **878** |
| Michigan | 176 | 121 | 9 | | **306** |
| Minnesota | 84 | 83 | 18 | | **185** |
| Missouri | 726 | 490 | 277 | 510 | **2,003** |
| North Carolina | 594 | 256 | 468 | 5 | **1,323** |
| North Dakota | 30 | 223 | 2 | | **255** |
| Nebraska | 3 | | | | **3** |
| New Hampshire | 48 | 5 | 3 | | **56** |
| New Jersey | 40 | 14 | 9 | | **63** |
| New Mexico | 99 | 118 | | | **217** |
| Nevada | 15 | 8 | | | **23** |
| New York | 50 | 94 | 27 | 23 | **194** |
| Ohio | 61 | 144 | 28 | 34 | **267** |
| Oklahoma | 316 | 516 | 989 | 5 | **1,826** |
| Oregon | 79 | 64 | 2 | 4 | **149** |
| Pennsylvania | 613 | 254 | 197 | 122 | **1,186** |
| Rhode Island | 18 | 55 | 15 | 2 | **90** |
| South Carolina | 76 | | | | **76** |
| Tennessee | 416 | 612 | 79 | 42 | **1,149** |
| Texas | 1,038 | 343 | 263 | 900 | **2,544** |
| Utah | 44 | 9 | 7 | | **60** |
| Virginia | 774 | 160 | 228 | 118 | **1,280** |
| Vermont | 7 | | 45 | | **52** |
| Washington | 173 | 94 | 17 | 1 | **285** |
| Wisconsin | 158 | 59 | 43 | 27 | **287** |
| Wyoming | 14 | 143 | | | **157** |
| Unknown | | | | | **10** |
| **TOTAL** | **9,844** | **8,100** | **4,866** | **2,445** | **25,265** |

E.      **EXAMPLES OF MISSED COTs**

120.    The following 15 examples of missed COTs are included in the 25,265 total COTs missed in SMART.

(A)      RehabCare clinicians provided occupational and physical therapy to N.S., a Medicare Part A beneficiary and a patient at Westbury, a SNF located in Jackson, Georgia. N.S.'s 14-day scheduled assessment occurred on November 26, 2011 (Day 13 of her 100-day Medicare Part A stay), and the RUG was set at Very High.  On Day 20, a COT review showed that her therapy had decreased, reducing the RUG for the seven-day lookback period from Very High to Medium and requiring a COT ARD.  But RehabCare did not set a COT ARD in SMART and fraudulently billed at the Very High level (instead of the required, lower level of Medium) for Days 14-20 (the seven-day lookback period) and Days 21-27.  On Day 27, the 30-day scheduled assessment showed a RUG of Very High that took effect on Day 31.  However, the next COT informal assessment took place on December 17, (DAY 34, seven days after the 30-day assessment on Day 27) and it showed that the RUG had dropped to High.  Once again, RehabCare did not set a COT ARD in SMART.  RehabCare fraudulently billed at the Very High level for Days 28-34 (the seven-day lookback period) and Days 35 through 38 (the day of discharge), when it should have billed at the High level as a result of the COT on Day 34.

Accordingly, on December 2, 2011, RehabCare sent a false and fraudulent invoice to Westbury that fraudulently billed $385.45 for five days of therapy in November 2011 at the Very High level (instead of the Medium level).  On January 6, 2012, RehabCare sent

Westbury a false and fraudulent invoice for $1,618.89, for 21 days of therapy at the Very High level (even though 10 of those 21 days should have been billed at the Medium level, and 11 of those 21 days should have been billed at the High level). RehabCare never sent Westbury corrected invoices, thereby strengthening the inference that RehabCare caused Westbury to falsely bill CMS for 29 days between November and December 2011.

(B)     RehabCare clinicians provided occupational and physical therapy to C.J., also a Medicare Part A beneficiary at Westbury in Jackson, Georgia. C.J.'s 14-day scheduled assessment occurred on November 13, 2011 (Day 13 of her 100-day Medicare Part A stay), and the RUG was set at Very High. On Day 27, a COT review showed that her therapy had decreased over the seven-day lookback period, reducing her RUG-level to Medium. But RehabCare did not set a COT ARD in SMART, and instead of billing Westbury at the Medium level, RehabCare fraudulently billed Westbury at the Very High level for Days 26-30 (the seven-day lookback period) and for Days 28-30, which were controlled by the COT on Day 27. Although the 30-day assessment on Day 32 showed the RUG-level increasing to Ultra High for Day 31, SMART showed the RUG-level dropping down to High, on Day 39. Despite that drop in therapy, RehabCare failed to set the COT ARD in SMART and fraudulently billed Westbury at the Ultra High level (instead of the High level) for Days 33-39. On Day 46, SMART showed that the RUG had dropped to Low. Yet, for the third time in a month, RehabCare failed to set the COT ARD in SMART and fraudulently billed at the Ultra High rate, instead of the Low rate, for the seven-day lookback period (*i.e.*, Days 41-46). It also fraudulently billed at Ultra High instead of Low for the following 6 days until discharge (*i.e.*, Days 47-52).

On December 2, 2011, RehabCare sent a false and fraudulent invoice to Westbury that fraudulently billed $770.90 for 10 days of therapy in November 2011 at the Very High rate (instead of the Medium rate).   On January 5, 2012, RehabCare sent a false and fraudulent invoice to Westbury that fraudulently billed $2,220.60 for 20 days of therapy at the Ultra High rate, seven days of which should have been billed at the High rate, and 13 days of which should have been billed at the Low rate.   RehabCare never sent Westbury corrected invoices, strengthening the inference that RehabCare caused Westbury to falsely bill CMS for 10 days in November and 20 days in December.

(C)      RehabCare clinicians provided occupational and physical therapy to P.B., also a Medicare Part A beneficiary at Westbury in Jackson, Georgia.   P.B.'s 14-day scheduled assessment occurred on Day 13 of her 100-day Medicare Part A stay (*i.e.*, February 18, 2012), and the RUG was correctly set at Very High beginning on Day 15.   On Day 20 (*i.e.,* February 25, 2012), a COT review showed that the therapy provided had decreased from Very High to High, for the seven-day lookback period.   However, RehabCare did not set a COT ARD in SMART reflecting the reduced therapy.   RehabCare fraudulently billed at the Very High level (instead of the High level) for Days 14-20 (the seven-day lookback period).   Subsequently, the therapy provided increased again to the Very High level; however, on Day 40 (*i.e.,* March 16, 2012), a COT review showed that the therapy decreased to the High level for the previous seven days.   Once again, RehabCare failed to set a COT ARD in SMART, and RehabCare fraudulently billed at the Very High level (instead of the High level) for Days 34 through 40 (the seven-day lookback period).   On Day 47 (*i.e.,* March 23, 2012), another COT ARD was required because the

44

RUG level fell even further to Medium.  For the third time in a month, RehabCare failed to set a COT ARD in SMART, and RehabCare continued to fraudulently bill at the Very High level for Days 41-47 (the seven-day lookback period), when it should have been billing the SNF at the Medium level for Days 41-47.

On March 6, 2012, RehabCare sent a false and fraudulent invoice to Westbury that fraudulently billed $539.63 for seven days of therapy in February 2012 at the Very High level instead of the High level due a COT missed in SMART on February 25, 2012.  On April 5, 2012, RehabCare sent Westbury a false and fraudulent invoice of $1,079.26 for 14 days of therapy at the Very High level, when seven of those days should have been billed at the High level, and the other seven of those days should have been billed at the Medium level.  Notably, RehabCare did not submit corrected invoices to Westbury for these bills, strengthening the inference that RehabCare caused Westbury to falsely bill CMS for seven days in February 2012 and 14 days in March 2012.

(D)      RehabCare clinicians provided occupational and physical therapy to L.G., a Medicare Part A beneficiary and a patient at Temple Manor, located in Temple, Oklahoma.  L.G.'s 14-day scheduled assessment occurred on March 8, 2012 (Day 18 of her 100-day Medicare Part A stay), and the RUG was set at Ultra High.  On March 22 (Day 32), a COT review showed that the therapy provided had decreased to the Medium level, for the seven-day lookback period.  RehabCare did not set a COT ARD in SMART, and it fraudulently billed at the Ultra High level (instead of at the Medium level) for Days 26-30.  While on Day 31 the actual RUG returned to Ultra High, on Day 80 (*i.e.,* May 9, 2012), a COT review showed the therapy provided had decreased to the Very High level.  Yet

RehabCare did not set a COT ARD in SMART and fraudulently billed at the Ultra High rate for both Days 74-80 (the seven-day lookback period) and Days 81-90, which also should have been controlled by COT on Day 80.  The 90-day scheduled assessment showed that the RUG returned to Ultra High on Day 91.  But on May 23 (Day 94), a COT review showed the RUG had dropped once again to Very High, controlling both the seven-day lookback period (superseding the 90-day assessment) as well as the remaining days of the beneficiary's 100-day stay.  RehabCare fraudulently billed at the Ultra High rate for days 81-100, when the rate was actually Very High.

Accordingly, on April 4, 2012, RehabCare sent Temple Manor a false and fraudulent invoice of $555 for five days of therapy in March 2012 at the Ultra High rate (instead of at the Medium rate).  It also billed $333 for three days of therapy in March 2012 at the Ultra High rate (instead of the Very High rate).  Further, on June 5, 2012, RehabCare sent Temple Manor a false and fraudulent invoice of $2,886 for 26 days of therapy in May 2012 at the Ultra High rate (instead of at the Very High rate).  RehabCare never sent corrected invoices for March or May 2015, thereby strengthening the inference that RehabCare caused Temple Manor to falsely bill CMS for eight days in March 2015 and 26 days in May.

(E)       RehabCare clinicians provided occupational and physical therapy to F.B., also a Medicare Part A beneficiary at Temple Manor in Temple, Oklahoma.  F.B.'s 30-day scheduled assessment occurred on June 25, 2012 (Day 27 of her 100-day Medicare Part A stay), and the RUG was set at Very High.  On July 9, a COT review showed that the therapy had decreased to the High level for the previous seven days.  But RehabCare did not set a

COT ARD in SMART, and it fraudulently billed at the Very High level (instead of the High level) for Days 35-41 (the seven-day lookback period).  At the next COT review on July 16, F.B. had received no therapy during the lookback period.  However, RehabCare did not set a COT ARD in SMART on July 16 and fraudulently billed for Days 42 through 49 (the discharge date) at the Very High level, when RehabCare should not have billed the SNF at all because RehabCare had provided no therapy to F.P. for that period of time.

Accordingly, on August 3, 2012, RehabCare sent Temple Manor a false and fraudulent invoice of $1,079.12 for 14 days of therapy in July 2012 at the Very High level (rather than accurately billing Temple Manor for seven days at the High level and no charge for seven days when RehabCare had provided no therapy to the beneficiary).  RehabCare never sent a corrected invoice for July 2012, thereby strengthening the inference that RehabCare caused Temple Manor to falsely bill CMS for 14 days in July 2012.

(F)     RehabCare clinicians provided occupational and physical therapy to A.A., a Medicare Part A beneficiary and a patient at Willow Park, located in Lawton, Oklahoma. A.A.'s 5-day scheduled assessment occurred on August 10, 2012 (Day 8 of his 100-day Medicare Part A stay), and the RUG was set at Ultra High.  Seven days later, on August 17 (Day 15), a COT review showed that the therapy provided had decreased to the Very High level for the seven-day lookback period.  However, RehabCare did not set a COT ARD in SMART.  RehabCare fraudulently billed at the Ultra High level (instead of at the Very High level) for Days 9-14 (six days of the seven-day lookback period).  While the RUG returned to Ultra High on Day 15, due to a 14-day scheduled assessment, on August 26 (Day 24), a subsequent COT review showed a reduction in A.A.'s therapy back down

to the Very High level for Days 18-24.  Once again, RehabCare failed to set a COT ARD in SMART, and RehabCare fraudulently billed at the Ultra High level (instead of at the Very High level) from Day 18 through 24 (the seven-day lookback period).

Accordingly, on September 7, 2012, RehabCare sent Willow Park a false and fraudulent invoice of $1,443 for 13 days of therapy in August 2012 at the Ultra High level (instead of the Very High level).  RehabCare never sent the SNF a corrected invoice, thereby strengthening the inference that RehabCare caused Willow Park to falsely bill CMS for 13 days in August 2012.

(G)     RehabCare clinicians provided occupational and physical therapy to A.R., a Medicare Part A beneficiary and a patient at Willow Park, located in Lawton, Oklahoma. A.R's 5-day scheduled assessment occurred on August 30, 2012 (Day 8 of her 100-day Medicare Part A stay), and the RUG was set at Ultra High.  On September 6, 2013 (Day 15), a COT review showed that the therapy provided had decreased to the Very High level for the seven-day lookback period.  However, RehabCare did not set a COT ARD in SMART.  RehabCare fraudulently billed at the Ultra High level (instead of at the Very High level) for Days 9-14 (*i.e.*, six days of the seven-day lookback period).  On Day 18, a 14-day scheduled assessment set the RUG at High starting on Day 15.  On September 16, 2013 (Day 25), a COT review showed that the therapy provided had decreased even further to the Medium level for the seven-day lookback period.  However, RehabCare did not set a COT ARD in SMART.  RehabCare fraudulently billed the SNF at the High level (instead of the Medium level) for Days 19-25 (the seven-day lookback period) and Days 26-30, which also should have been controlled by the RUG set by the COT on Day 25.  On Day

48

31, a 30-day assessment returned the RUG to High.  However, on October 14 (Day 53), a COT review showed that the therapy provided had decreased to the Low level for the seven-day lookback period.  But RehabCare did not set a COT ARD in SMART. RehabCare fraudulently billed the SNF at the High level (instead of the Low level) for Days 47-53 (the seven-day lookback period) and Day 54, the last day of A.R.'s 100-day stay, which was controlled by the RUG set by the COT on Day 53.

Accordingly, on September 7, 2012, RehabCare sent Willow Park a false and fraudulent invoice for $111, for one day of therapy in August 2012 at the Ultra High level (instead of at the Very High level) due to a COT missed in SMART on September 6, 2012. On October 3, 2012, RehabCare sent Willow Park a false and fraudulent invoice charging $555 for five days of therapy in September 2012 at the Ultra High (instead of the Very High level), and $601.32 for 12 days of therapy at the High level (instead of the Medium level), due to COTs missed in SMART on September 6 and 16.  Finally, on November 5, 2012, RehabCare sent Willow Park a false and fraudulent invoice charging $400.88 for eight days of therapy in October 2012 at the High level (instead of the Low level) due to a COT missed in SMART on October 14.   RehabCare never sent Willow Park corrected invoices for August through October, thereby strengthening the inference that RehabCare caused Willow Park to falsely bill CMS for 26 days between August and October 2012.

(H)     RehabCare clinicians provided occupational and physical therapy to P.S., a Medicare Part A beneficiary and a patient at Wingate at Haverhill, located in Haverhill, Massachusetts.  P.S.'s 14-day scheduled assessment occurred on February 10, 2013 (Day 14 of her 100-day Medicare Part A stay), and the RUG was set at Medium.  On February

49

17, 2013 (Day 21), a COT review showed that RehabCare had not provided therapy to P.S. at all during the prior seven days.  However, RehabCare did not set a COT ARD in SMART.  RehabCare fraudulently billed at the Medium level not only for Days 15-21 (the seven-day lookback period), but also for Days 22-44, <u>even though RehabCare provided no therapy at all to P.S. during that time.</u>

Accordingly, on March 4, 2013, RehabCare sent Wingate at Haverhill a false and fraudulent invoice of $378 for 18 days of therapy in February 2013 at the Medium level, when RehabCare was not entitled to any payment because no therapy was rendered for those 18 days.  Likewise, on April 2, 2013, RehabCare sent Wingate at Haverhill a false and fraudulent invoice of $252 for 12 days of therapy in March at the Medium level, despite the fact that RehabCare had provided no therapy to P.S. during that month.  RehabCare never sent Wingate at Haverhill corrected invoices for February or March 2013, thereby strengthening the inference that RehabCare caused Wingate of Haverhill to falsely bill CMS for 30 days between February and March 2013, when RehabCare had provided no therapy to the patient.

(I)      RehabCare clinicians provided occupational and physical therapy to D.C., a Medicare Part A beneficiary and a patient at Willow Park, located in Lawton, Oklahoma. D.C.'s 30-day scheduled assessment occurred on June 26, 2013 (Day 29 of her 100-day Medicare Part A stay), and the RUG was set at Ultra High.  On July 10 (Day 43), a COT review showed that the therapy provided had decreased to the Medium level for the seven-day lookback period.  RehabCare did not set a COT ARD in SMART, and it fraudulently billed at the Ultra High level (instead of at the Medium level) for Days 37-43 (the seven-

day lookback period).   Although a July 17 COT review showed that the therapy had increased to the Ultra High level, the therapy level for this beneficiary dropped again on August 2 (Day 66), albeit to the Very High Level.   RehabCare should have set a COT ARD in SMART because of this reduction in therapy, but it did not. Additionally, RehabCare fraudulently billed the SNF at the Ultra High level (instead of the Very High Level) for Days 60-66 (the seven-day lookback period).   The level of therapy then increased to the Ultra High level for the next two COT reviews, but it dropped again to Very High, on August 23 (Day 87).   RehabCare should have set a COT ARD, in light of this reduction of therapy, but it did not.   RehabCare fraudulently billed the SNF at Ultra High for Days 81-87 (the seven-day lookback period) and for days 88-90, which were also controlled by the August 23 COT.

Accordingly, on August 5, 2013, RehabCare sent Willow Park a false and fraudulent invoice of $1,332, for 12 days of therapy in July 2013, at the Ultra High rate, five days of which should have been billed at the Very High rate, and seven days of which should have been billed at the Medium rate.   Similarly, on September 4, 2013, RehabCare sent Willow Park a false and fraudulent invoice of $1,332 for 12 days of therapy in August 2013 at the Ultra High rate (instead of the Very High rate).   RehabCare never sent corrected invoices for July or August 2013, thereby strengthening the inference that RehabCare caused Willow Park to falsely bill CMS for 12 days in July 2013 and 12 days in August 2013.

(J)      RehabCare clinicians provided occupational and physical therapy to S.P., a Medicare Part A beneficiary and a patient at Point Lookout Nursing Rehabilitation, located

in Hollister, Missouri.  S.P.'s 14-day scheduled assessment occurred on April 29, 2014 (Day 15 of her 100-day Medicare Part A stay), and the RUG was set at Very High.  On May 6 (Day 22), a COT review showed that the therapy provided had decreased to the Low level for the seven-day lookback period.  However, RehabCare did not set a COT ARD in SMART.  RehabCare also fraudulently billed at the Very High level (instead of the Low level) for Days 16-22 (the seven-day lookback period).  During the next seven days, RehabCare provided no therapy to S.P., and a COT review on May 13 (Day 29) placed her in a non-rehabilitation RUG.  Nonetheless, RehabCare fraudulently billed at the Very High level for Days 23-29, even though RehabCare had provided no physical or occupational therapy to S.P. at all.

Accordingly, on May 5, 2014, RehabCare sent Point Lookout Nursing Rehabilitation a false and fraudulent invoice of $71.43 for one day of therapy in April 2014 at the Very High level (instead of at the Low level).  On June 3, 2014, RehabCare sent Point Lookout Nursing Rehabilitation a false and fraudulent invoice of $928.59, for 13 days of therapy in May 2014 at the Very High level when six of those days should have been billed at the Low level, and the other seven of those days should not have been billed at all because RehabCare had not provided any therapy to S.P.  RehabCare never sent corrected invoices for April or May 2014, thereby strengthening the inference that RehabCare caused Point Lookout Nursing Rehabilitation to falsely bill CMS for one day in April and for 13 days in June 2014.

(K)     RehabCare clinicians provided occupational and physical therapy to G.P., a Medicare Part A beneficiary and a patient at Bellefontaine Gardens, located in

Bellefontaine, Missouri.  Prior to a COT on May 11, 2014, the RUG was set at Ultra High.

On May 11, 2014 (Day 48), a COT review showed that the therapy provided had decreased

to the Very High level for the seven-day lookback period.  However, RehabCare did not

set a COT ARD in SMART.  RehabCare fraudulently billed the NSF at the Ultra High level

for Days 42-48 (the seven-day lookback period), instead of accurately billing at the *lower*

Very High level.  On May 18 (Day 55), the RUG remained at Very High, triggering a

second COT.  Once again, RehabCare did not set a COT ARD in SMART.  RehabCare

fraudulently billed at the Ultra High level for Days 49-55 (the seven-day lookback period)

and Days 56-60, which were controlled by the RUG set by the COT on Day 55.

Accordingly, on June 3, 2014, RehabCare sent Bellefontaine Gardens a false and

fraudulent invoice for $1,954.34, for 19 days of therapy in May 2014 at the Ultra High

level, instead of the Low level, due to two COTs missed in SMART on May 11 and 18,

2014.  RehabCare never sent a corrected invoice, thereby strengthening the inference that

RehabCare caused Bellefontaine Gardens to falsely bill CMS for 19 days in May 2014.

(L)     RehabCare clinicians provided occupational and physical therapy to D.D.,

a Medicare Part A beneficiary and a patient at Charlwell Healthcare LLC located in

Norwood, Massachusetts.  D.D.'s 30-day scheduled assessment occurred on January 24,

2015 (Day 27 of her 100-day Medicare Part A stay), and the RUG was set to Very High.

On January 31, 2015 (Day 34), a COT review showed that the therapy provided had

decreased to the Low level for the seven-day lookback period placed.  RehabCare did not

set a COT ARD in SMART, and it fraudulently billed at the Very High level (instead of at

the Low level) for Days 28-34 (the seven-day lookback period) and Day 35, which should have been controlled by the COT on Day 35 as well.

Accordingly, on February 2, 2015, RehabCare sent Charlwell Healthcare LLC a false and fraudulent invoice for $525, for seven days of therapy in January 2015 at the Very High level (rather than at the Low level). On March 2, 2015, RehabCare sent Charlwell Healthcare LLC another fraudulent invoice of $75 for therapy purportedly delivered at the High level (instead of the Low level) on February 1, 2015.  RehabCare never sent corrected invoices for January or February 2015, thereby strengthening the inference that RehabCare caused Charlwell Healthcare LLC to falsely bill CMS for seven days in January and one day in February 2015.

(M)     RehabCare clinicians provided occupational and speech therapy to N.C., a Medicare Part A beneficiary and a patient at Riverside Nursing and Rehabilitation Center, located in Austin, Texas.  N.C.'s 30-day scheduled assessment occurred on March 6, 2015 (Day 29 of her 100-day Medicare Part A stay), and the RUG was set at Very High.  On March 13 (Day 36), a COT review showed that the therapy provided had decreased to the Low level for the seven-day lookback period.  RehabCare did not set a COT ARD in SMART, and it fraudulently billed at the Very High level (instead of the Low level) for Days 31-36 (the seven-day lookback period).  At the next COT review on March 20 (Day 43), N.C. had not received therapy during the seven-day lookback period.  Thus, RehabCare should not have billed the SNF anything at all for the period of time controlled by the March 20 COT.  Instead, RehabCare fraudulently billed the SNF at the Very High

level (instead of not billing at all) for Days 37-43 (the seven-day lookback period) and for Days 44-47, which also were controlled by the March 20 COT.

Accordingly, on April 1, 2015, RehabCare sent Riverside Nursing and Rehabilitation a false and fraudulent invoice for $1,272.78, for 18 days of therapy at the Very High rate, seven days of which should have been billed at the Low rate, and 11 days of which should not have been billed at all. RehabCare never sent the SNF a corrected invoice, thereby strengthening the inference that RehabCare caused Riverside Nursing and Rehabilitation to falsely bill CMS for 18 days in March 2015.

(N)     RehabCare clinicians provided occupational and physical therapy to F.M., a Medicare Part A beneficiary and a patient at Wingate at Wilbraham, located in Wilbraham, Massachusetts. F.M.'s 30-day scheduled assessment occurred on March 25, 2015 (Day 33 of her 100-day Medicare Part A stay), and the RUG was set to Ultra High. On April 8, 2015 (Day 47), a COT review showed that the therapy provided had decreased to the High level, for the seven-day lookback period. But RehabCare did not set a COT ARD in SMART, and it fraudulently billed at the Ultra High level (instead of at the High level) for Days 41-47 (the seven-day lookback period).

Accordingly, on May 1, 2015, RehabCare sent Wingate at Wilbraham a false and fraudulent invoice for $743.96, for seven days of therapy in April 2015 at the Ultra High level (instead of the High level). RehabCare never sent the SNF a corrected invoice, thereby strengthening the inference that RehabCare caused Wingate at Wilbraham to falsely bill CMS for seven days in April 2015.

55

(O)     RehabCare clinicians provided occupational, physical, and speech therapy to T.B., a Medicare Part A beneficiary and a patient at Grace Healthcare of Cordova, located in Cordova, Tennessee.  T.B.'s 30-day scheduled assessment occurred on June 2, 2015 (Day 27 of his 100-day Medicare Part A stay), and the RUG was set at Ultra High. On June 30 (Day 55), a COT review showed that the therapy provided had decreased to the Medium level for the seven-day lookback period.  However, RehabCare did not set a COT ARD in SMART.  RehabCare fraudulently billed at the Ultra High level (instead of at the Medium level) for Days 49-55 (the seven-day lookback period).

Accordingly, on July 1, 2015, RehabCare sent a false and fraudulent invoice to Grace Healthcare of Cordova that fraudulently billed $756 for seven days of therapy in June 2015 at the Ultra High level (instead of at the Medium level).  RehabCare never sent the SNF a corrected invoice, thereby strengthening the inference that RehabCare caused Grace Healthcare of Cordova to falsely bill CMS for seven days in June 2015.

## F.     REHABCARE KNOWINGLY PURSUED THE COT FRAUD SCHEME

121.    RehabCare and its officers were well aware that RehabCare had repeatedly failed to comply with CMS rules and regulations regarding COTs and had filed, and had caused to be filed, false and fraudulent claims for payment or approval to contractors, officers, or employees of the United States Government and the States of California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington as well as the Commonwealths of Massachusetts and Virginia.  Indeed, since October

2011, Relator has warned her superiors at RehabCare of missed COTs, and the need to address the matter; however, RehabCare executives have ignored her warnings.

For example:

(A)    Since October 2011, Relator has periodically reviewed COT alerts in SMART for the client SNFs within her region(s).  Relator regularly informed the relevant Vice President(s) and Area Managers of the COT alerts, typically during weekly conference calls.  During these calls Relator emphasized the importance of "clearing" these alerts (*i.e.,* setting the COT ARDs in SMART and informing the client SNFs of the need to set COT ARDs in their systems).  Despite Relator's warnings, no one at RehabCare adequately addressed the systematic failure to comply with COT rules and to invoice SNFs at the proper rates.

(B)    On information and belief, other Clinical Performance Specialists similarly warned RehabCare executives about billing inaccuracies due to COTs missed in Smart.

(C)    Relator repeatedly told various Vice Presidents, including her direct supervisor, Division Vice President for Clinical Operations, Matt Sivret, that in order to preserve the accuracy of RehabCare's invoices COT alerts would have to be designated "mandatory to clear."  This meant that RehabCare would have to program SMART to prevent an invoice from being generated until all COT ARDs affecting that invoice were set in SMART.  This was a simple solution, since SMART was already programed to require certain alerts to be cleared before generating an invoice.  Mr. Sivret and others at RehabCare repeatedly ignored Relator's suggestions that COT alerts be included amongst those alerts that needed to be cleared before generating an invoice.

57

(D)     On or about December 9, 2014, Relator raised the issue of noncompliant COTs at a training for RehabCare management held in St. Louis, Missouri.  Mr. Sivret and numerous other employees in the Clinical Operations Division were present.  Mr. Sivret said that he would look into the matter.  However, he never followed up on the matter with Relator, and the problem persisted.

(E)     In 2015, Relator began addressing the COT compliance issue in writing on a weekly basis.  She used SMART to run reports showing COTs missed in SMART during the previous week and emailed them to Vice Presidents Vonda Black and Laura Dunn as well as to the Area Managers beneath them.  Despite these weekly reminders of the systematic failure to comply with COT rules, RehabCare did not address the problem.

(F)     On or about March 23, 2015, Relator raised the issue of noncompliant COTs at a subsequent training for RehabCare management held in St. Louis, Missouri.  Both Matt Sivret and Jim Douthitt, RehabCare's Chief Operating Officer, were present along with numerous other employees in the Clinical Division.  Both Mr. Sivret and Mr. Douthitt said that they would look into Relator's concerns.  However, neither followed up on the matter with Relator, and the problem persisted.

(G)     On a monthly basis, since April 2015, Relator has warned her chain of command at RehabCare that the company has not informed its client SNFs of the need to set COT ARDs when appropriate.  She sent monthly "Clinical Performance Specialist Report Summaries" to the Division Vice President of Clinical Operations and various other Vice Presidents detailing her activities and priorities that month.  Each of her "Clinical

Performance Specialist Report Summaries" included the following statement under the heading "Weekly Reports":

> SMART review to focus on COT which resulted in RUG changes. The items listed in BOLD are COT OMRAs which were not entered into SMART. Strong focus for compliance and customer relationships. ADO/PD [Area Directors of Operations/Program Directors] are instructed to closely monitor these on daily basis via SMART alerts.

This paragraph indicated to her superiors that Relator had run weekly reports showing COT ARDs not entered into SMART and was meant to encourage her superiors to address the systemic problem of COTs missed in SMART. They did not.

122. In December 2015, Kindred Senior Vice President for Quality and Care Management Mary Van de Kamp presided over a meeting held in Louisville, Kentucky with RehabCare's Clinical and Compliance Departments. Among those present at the meeting was Matt Sivret and the Clinical Performance Specialists. During the meeting, Ms. Van de Kamp asked each of the Clinical Performance Specialists to share with the group what, if anything, kept them awake night. Relator responded that she had two main concerns. The first was a problem with incomplete documentation (*see* discussion in Section XII below). The second was a problem with change of therapy compliance. Specifically, RehabCare was not billing at the RUG levels provided, which caused the customers to bill Medicare incorrectly. Another Clinical Performance specialist also mentioned incomplete documentation. In response to Relator's concern with COT compliance, Ms. Van de Kamp stated that it was the SNF's responsibility and not RehabCare's responsibility to comply with COT reporting requirements. She did not respond to the concerns raised about incomplete documentation.

123.   In addition to Relator's warnings, the following facts, among others, demonstrate that RehabCare was aware of the requirement to follow COT rules and its failure to do so:

(A)   Kindred's 2015 "Code of Conduct" stated, "The False Claims Act applies to Medicare and Medicaid program reimbursement and prohibits, among other things, billing for services not rendered; . . . and retaining an overpayment for services or items."

(B)   RehabCare's website includes a detailed description of the COT rules that was created prior to their introduction on October 1, 2011. *See Change of Therapy OMRAs*, http://rehabcarejobs.com/news/change-of-therapy-omras (last visited Aug. 21, 2015).

(C)   Prior to the introduction of the COT rules on October 1, 2011, RehabCare conducted extensive training of its own personnel on complying with the upcoming changes.  Relator both received training on the COT rules and delivered multiple trainings on the same rules.

(D)   RehabCare systematically and repeatedly ignored the bright yellow alerts that appeared in the SMART planner screen signaling the need to set COT ARDs.

(E)   RehabCare systematically and repeatedly ignored the COT alerts that appeared in the SMART resident screen signaling the need to set COT ARDs and also alerting it to missed COT ARDs.

(F)   RehabCare had SMART programmed, so that the alert for a missed COT ARD would not be "mandatory to clear," thereby allowing inaccurate invoices to be sent to client SNFs.

(G)     On information and belief, RehabCare did not program SMART to automatically set COT ARDs, or to automatically set the appropriate rehabilitation RUG level to be billed to RehabCare's client SNFs.

## XII.   THE INCOMPLETE DOCUMENTATION FRAUD SCHEME

### A.     REQUIREMENTS FOR DEVELOPING AND MAINTAINING PROPER DOCUMENTATION

124.   Payments for services rendered to beneficiaries of both Medicare Part A and Part B must be reasonable and necessary.  42 U.S.C. § 1395y(a)(l)(A).

125.   Documentation is required to determine and support the reasonableness and necessity of the services rendered.  *See, e.g.*, Medicare Benefit Policy Manual, ch. 15 § 220.3(B) ("When a service is reasonable and necessary, the patient also needs the services. Contractors determine the patient's needs through knowledge of the individual patient's condition, and any complexities that impact that condition, as described in documentation (usually in the evaluation, re-evaluation, and progress report).").  Rehabilitation therapists treating Medicare Part A and Part B beneficiaries must develop and maintain specified medical documents in order to "justify the services billed." CMS, Medicare Benefit Policy Manual, ch. 15 § 220.3(A).

126.   Required documentation begins prior to the patient's initial treatment and concludes at the patient's discharge from care.

127.   As detailed below, CMS requires rehabilitation therapy providers to establish and maintain the following five types of documentation relevant here and used to justify services billed: (1) plan of care; (2) treatment notes; (3) progress reports; (4) certification and recertification of the plan of care, and (5) functional reporting codes, also known as, "G-codes" (hereinafter

broadly, "documentation requirements").  The law requires completion and maintenance of this

documentation because it is critical to the patient's health and justifies the services billed.

128.  <u>Plan of Care</u>.  Prior to initial treatment, a treating physician, clinical nurse,

occupational therapist, physical therapist, or speech-language pathologist must establish a plan of

care (also referred to as a plan of treatment).  CMS, Medicare Benefit Policy Manual, ch. 15 §

220.1.2(A).  The plan of care is often developed when the therapist conducts the initial evaluation

of the patient.  *See* CMS, Medicare Benefit Policy Manual, ch. 15 § 220.3(C).  The evaluation is

a billable event under Medicare Part A or Medicare Part B.  *See* CMS, Medicare Benefit Policy

Manual, ch. 15 § 220(A).

129.  The plan of care identifies the patient's diagnosis as well as the anticipated goals

for therapy.  *See* 42 C.F.R. § 410.61(c).  It furthermore "prescribes the type, amount, frequency,

and duration" of the therapy services expected to be furnished over the course of the patient's

treatment.  *Id.*  Unless the plan of care is changed, all subsequent outpatient services must be

furnished under the initial plan of care.  *See* 42 C.F.R. § 410.61(a)-(d); 42 C.F.R. § 424.24(c)(iii).

If changes in the patient's clinical needs arise, changes must be made to the plan of care.  Minor

changes (such as changes in goals) are made in a supplemental plan of care, and major changes

that require reassessment of the patient's needs are made in an updated plan of care.  Significant

changes require recertification.  CMS, Medicare Benefit Policy Manual, ch. 15 § 220.1.2(C).

130.  A plan of care is particularly important because guidance for future treatment – and

thus the patient's health – depends upon it.    If a clinician treats a patient in the middle of a

treatment regime, but has no plan or has an incomplete plan, the clinician may not know the

patient's particular needs.  A clinician relies on information in a plan of care to determine whether

a patient's condition may render certain therapies ineffective or even damaging.  For example, a plan of care might note that a patient has had orthopedic surgery and is not supposed to put any weight on the affected leg.  In the absence of such a plan of care, a clinician might mistakenly ask the patient to stand and threaten the integrity of the surgical repair.  Similarly, a plan of care might note that a patient is recovering from a stroke and therefore should not be engaging in vigorous exercise when exhibiting high blood pressure.  In the absence of such a plan of care, a clinician might fail to check the patient's blood pressure prior to exercise, leading to an additional stroke.

131.   <u>Certification and Recertification of the Plan of Care</u>.  An attending physician or non-physician practitioner must certify approval of the plan of care in order to meet the periodic review requirement of the Social Security Act.  *See* 42 U.S.C. § 1395(n)(a)(2); CMS, Medicare Benefit Policy Manual, ch.15 §§ 220.1.3(A) & (E).

132.   The format of the certification is flexible and often is simply a dated signature by the attending physician on the plan of care acknowledging its content.  *Id.*  Regardless of the format, the attending physician should certify the plan of care "as soon as possible after the plan of care is established," meaning "within 30 days of the initial therapy treatment."  CMS, Medicare Benefit Policy Manual, ch. 15 § 220.1.3(B).

133.   Each certification is valid for up to 90 calendar days, after which a physician or a non-physician practitioner must recertify the plan.  *Id.* § 220.1.3(C).  Recertification is also required "whenever the need for a significant modification of the plan becomes evident . . . ."  *Id.*

134.   <u>Treatment Notes</u>.  Once therapy services have commenced, "documentation is required for every treatment day, and every therapy service," in the form of treatment notes  *Id.* § 220.3(E).  These treatment notes create a record of all treatments and skilled interventions by

identifying the specific services provided during each therapy session. *Id.* Therefore, the notes must contain a description of the services rendered that is consistent with, and justifies, the services billed. *Id.* Each treatment note must also contain the date of treatment, the duration of the treatment (in minutes), and the signature of the therapist who furnished the services. *Id.*

135.   <u>Progress Reports</u>.   Periodic progress reports are required to provide "justification for the medical necessity of treatment" by evaluating the progress made towards the goals outlined in the plan of care. CMS, Medicare Benefit Policy Manual, ch. 15 § 220.3(D). More specifically, the progress report must include an assessment of the improvement (or lack thereof) toward each goal, the plan for continuing treatment, and, if necessary, the need to adjust the plan of care. *Id.* A progress report is required, at a minimum, once every ten (10) treatment-days. *Id.* The final progress report, which covers the period immediately prior to the cessation of therapy services, is referred to as a discharge note. *Id.*

136.   Progress reports allow therapists to determine if changes to treatment need to be made in light of a patient's progress (or lack thereof) toward his/her goals as well as a patient's ability to tolerate treatment. In addition, therapists will document patient and family education (*e.g.*, teaching a patient or a family member how to conduct a particular exercise) in a progress report, so that education is not repeated (or can be refreshed) in future sessions.

137.   <u>G-codes</u>.   Beginning on July 1, 2013, in accordance with the Middle Class Tax Relief and Job Creation Act of 2012, CMS began requiring that the documentation for Medicare Part B skilled therapy services include a functional reporting code, commonly referred to as a "G-code," as well as a "severity modifier." CMS has established 42 functional G-codes and seven severity modifiers that relate to skilled therapy services. *See* CMS, Medicare Benefits Policy

Manual § 220.4.  The G-Codes are divided into different types of physical limitations, such as mobility; changing and maintaining body position; or carrying, moving, and handling objects.  The severity modifiers correspond to a percentage of impairment, limitation, or restriction.  For example, the "CL" severity modifier corresponds to at least 60 percent but less than 80 percent impaired, limited, or restricted. Thus, the G-code and severity modifier "G8978-CL" signifies that the beneficiary's current mobility is between 60% and 80%.

138.  A G-code is recorded both for the beneficiary's current status and for the beneficiary's goal status.  For example, while a beneficiary's current status may be G8978-CL, her goal status may be G8979-CJ, indicating that the goal is to improve from 60%-80% impaired to only 20%-40% impaired.

139.  G-codes must be reported at the outset of therapy services, once every ten (10) treatment days (corresponding with progress reports), at discharge, and at other specified times warranted by a significant change in patient treatment. CMS, Medicare Claims Processing Manual, ch. 5 § 10.6.  Thus, G-codes must be completed at the same time as the plan of care and progress reports, including the discharge note.  G-codes are often included in plans of care but not necessarily in progress reports or discharge notes.  Instead, G-codes may be included (and at RehabCare were included) on the service log documenting the services provided to a beneficiary on a given day.

140.  G-codes are required on reimbursement claims submitted under Medicare Part B, so that CMS can track the condition of the patient over the course of therapy and monitor the consistency of services with the plan of care.  *See* 42 C.F.R. § 410.59(a)(4) (physical therapy); 42 C.F.R. § 410.60(a)(4) (occupational therapy); 42 C.F.R. § 410.62(a)(4) (speech-language

pathology); 42 C.F.R. § 410.61(c); *see also* CMS, Medicare Claims Processing Manual, ch. 5 § 10.6.

141. All of the required documents – plans of care, certifications and recertifications of plans of care, treatment notes, progress reports, and G-codes – must be maintained by the provider and "are expected to be submitted in response to any requests for documentation." CMS, Medicare Benefit Policy Manual, ch. 15 § 220.3(B).

## B. CERTIFICATION OF COMPLIANCE WITH DOCUMENTATION REQUIREMENTS

### i. *Certifications in CMS Form 855A*

142. To obtain a Medicare provider number and to be eligible to file a claim for payment with Medicare, a SNF or an Outpatient Physical Therapy/Occupational Therapy/Speech Pathology Services provider must submit a Medicare Enrollment Application for Institutional Providers. CMS Form 855A is used for this purpose.  On information and belief, RehabCare and its SNF clients completed CMS Forms 855A.

143. As part of the CMS Form 855A, without which these providers may not seek reimbursement from Medicare, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

144. The providers, such as the SNFs, must also sign a "Certification Statement," which contains the following provisions and requirements, *inter alia*, in order for the provider to remain

enrolled in Medicare.  By signing the "Certification Statement," the provider agrees "to adhere to

the following requirements stated in this Certification," including:

1. I agree to notify the Medicare contractor of any future changes to the information contained in this application in accordance with the time frames established in 42 C.F.R. § 424.516(e).

2. I have read and understand the Penalties for Falsifying Information . . . I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare . . . may be punished by criminal, civil or administrative penalties, including but not limited to the denial or revocation of Medicare billing privileges, and/or the imposition of fines, civil damages, and/or imprisonment.

3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

. . .

6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Id.*

145.    The Certification Statement is executed by an "Authorized Official" of the

Institutional Provider, which is defined as an appointed official (for example, chief executive

officer, chief financial officer, general partner, chairman of the board, or direct owner) to whom

the organization has granted the legal authority to enroll it in the Medicare program, to make

changes or updates to the organization's status in the Medicare program, and to commit the

organization to fully abide by the statutes, regulations, and program instructions of the Medicare

program.  *Id.*

67

146.   "By his/her signature(s), an authorized official binds the provider to all requirements listed in the Certification Statement and acknowledges that the provider may be denied entry to or revoked from the Medicare program if any requirements are not met."  *Id.*

147.   The certifications, made by the provider in the CMS Form 855A, are mandatory for Medicare enrollment and expressly create a continuing duty to comply with the conditions of participation in, and payment by, the Medicare program.

148.   The authorized agent who signs the Certification Statement on behalf of the provider "agrees to immediately notify the Medicare fee-for-service contractor if any information furnished on this application is not true, accurate or complete.  In addition, an authorized official, by his/her signature, agrees to notify the Medicare fee-for-service contractor of any future changes to the information contained in this form, after the provider is enrolled in Medicare, in accordance with the timeframes established in 42 C.F.R. § 424.516(e)."  *Id.*

149.   In the Medicare Enrollment Application for Institutional Providers, CMS Form 855A, and the Certification Statement set forth therein, Kindred, its RehabCare predecessor, and their client SNFs agreed to abide by all applicable Medicare laws, regulations and program instructions.  They also certified that they understood the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and applicable program instructions and on the home health care agency's compliance with all applicable conditions of participation in Medicare.

150.   Accordingly, when RehabCare invoiced its clients, it did so subject to and under the terms of their Certification to the United States that the services for which payment was sought were delivered in accordance with federal law.  However, since RehabCare repeatedly failed to

comply with documentation requirements, it rendered false its certifications in the relevant CMS Forms 855A. Thus, RehabCare's invoices to its client SNFs for services that were unsupported by the required documentation were false, because they were based on false certifications in its CMS Form 855A.

151. In addition, RehabCare's client SNFs relied on RehabCare to maintain proper documentation for the services it provided. By failing to maintain that documentation, RehabCare caused its client SNFs to falsely certify compliance with documentation requirements on their CMS Forms 855A. On information and belief, RehabCare's client SNFs submitted claims to the MACs for services rendered by RehabCare to Medicare Part A or Part B beneficiaries when such services were not supported by the required documentation. RehabCare caused these claims to be false, because they were based on certifications in the SNFs CMS Forms 855A that RehabCare had rendered false by failing to develop and maintain the required documentation.

ii.   *Certifications in CMS Form 1450*

152. In addition, when a SNF submits a claim for reimbursement for services rendered under Medicare Part A or Part B, the SNF must certify its compliance with documentation requirements in CMS Form 1450 (or its electronic equivalent).

153. A SNF first must certify that: "Physician's certifications and re-certifications, if required by contract or Federal regulations, are on file." CMS Form 1450.

154. It also must certify that: "Records adequately disclosing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law." *Id.*

155.   Further, a SNF submitting CMS Form 1450 must certify as follows:  "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.  That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."  In fact, however, RehabCare caused its client SNFs to conceal material facts, namely, noncompliance with documentation requirements.

156.   On information and belief, RehabCare's client SNFs submitted CMS Forms 1450 seeking reimbursement for services rendered by RehabCare to Medicare Part A or Part B beneficiaries when such services were not supported by the required documentation.

157.   RehabCare's client SNFs relied on RehabCare to maintain proper documentation for the services it provided.  By failing to maintain that documentation, RehabCare caused its client SNFs to falsely certify compliance with documentation requirements on the CMS Forms 1450 submitted with their claims.  Thus, RehabCare caused its client SNFs to submit false claims through their CMS Forms 1450.

### C.   PROPER DOCUMENTATION IS MATERIAL TO THE MAC'S PAYMENT DECISIONS UNDER MEDICARE PART A AND PART B

158.   Developing and maintaining the documentation discussed in Section XII(A) above (*i.e.*, paras. 124-141) is material to the MAC's payment decisions under both Medicare Part A and Part B, because, *inter alia*, (1) proper documentation is an express legal precondition of payment under Medicare Part A and B (*see* 42 U.S.C. §§ 1395f(a)(2) & 1395n(a)(2); *see also*  42 C.F.R. § 424.5(a); CMS, Medicare Benefit Policy Manual, ch. 15 § 220.3(A) (emphasis added)); (2) Medicare claims are consistently denied for failure to develop and maintain supporting documentation; and (3) proper documentation is central to the Medicare reimbursement scheme.

159.   Proper documentation is central to the Medicare reimbursement scheme, because it is needed to support a determination that the services rendered were reasonable and necessary. The MACs rely on documentation to determine whether services rendered were reasonable and necessary and, therefore, reimbursable.  Documentation is central to the regime that ensures that patients receive the services they need, and that the government does not pay for unnecessary or unreasonable services.

160.   In addition, the importance of proper documentation to patient safety renders documentation requirements central to the regulatory scheme.  Without proper documentation, practitioners may be operating in the blind and may provide unsuitable or dangerous treatment in light of undocumented patient conditions, or they may fail to properly treat conditions they do not know about because they are undocumented.  Proper documentation is not only necessary to justify treatment.  It is part of the treatment.  It helps guide the treatment.  Without proper documentation, patient health can suffer.

161.   RehabCare was well aware that CMS regularly denied claims based on incomplete documentation.  In fact, RehabCare agreed to indemnify its clients should CMS refuse to reimburse the clients for services unsupported by proper documentation.  *See, e.g.*, *United States ex rel. Halpin, et al. v. Kindred Healthcare, Inc., Rehabcare Group, Inc., et al.*, No. 1:11cv12139-RGS, Docket #62, ex. 1 ¶ 5.4 (Jan. 12, 2016) (contract required RehabCare to reimburse the SNF when CMS denied a claim for "incorrect or inadequate documentation").

162.   RehabCare was not only aware that CMS denied claims *generally* based on incomplete documentation, but it was also aware that CMS denied claims by its client SNFs for services rendered by RehabCare that were not supported by the required documentation.  Relator

worked closely with RehabCare's Appeals and Denials Department.   That department was responsible for appealing denials of Medicare claims.   Relator received feedback from RehabCare's Appeals and Denials Department on the types of claims that CMS frequently denied. Relator learned that CMS routinely denied claims unsupported by proper documentation, and that RehabCare was responsible for reimbursing its client SNFs for these denials.  Relator is not aware of any situations in which the government paid for services rendered by RehabCare, when CMS knew that the services were not sufficiently documented.

### D.   REHABCARE FAILED TO DEVELOP AND MAINTAIN PROPER DOCUMENTATION FOR SERVICES BILLED TO CMS

*i.   Plans of Care, Progress Reports, and G-codes*

163.   RehabCare clinicians complete plans of care, progress reports, and G-codes electronically using the SMART system on a computer, such as a tablet or a desktop.  For example, a clinician may use a tablet computer to access SMART and complete a plan of care at the outset of treatment.

164.   SMART alerts RehabCare clinicians when they have not properly completed their plans of care, progress reports, or G-codes.  Those alerts are visible to RehabCare executives, who have daily access to and regularly monitor SMART.  RehabCare executives also receive reports generated by SMART regarding missing documentation.   Despite the alerts and reports of pervasive, missing documentation, RehabCare management ignored them, thereby jeopardizing patient safety and causing serious false billing.   The SMART alerts regarding required documentation worked as follows:

(A)   First, if a clinician enters the initial plan of care, but does not complete the

plan, then SMART will alert the clinician that the plan is incomplete and will highlight the

areas that require completion.  For example, if the clinician neglects to enter the patient's goals, SMART will alert the clinician to the missing goals when the clinician saves the plan of care.

(B)     Second, if a clinician does not complete a plan of care for a beneficiary, SMART will not allow the clinician to even begin completion of the first progress report for that beneficiary.

(C)     Third, SMART alerts the clinician if s/he omits required information from a progress report.  For example, if the clinician does not enter the justification for continued services, SMART will alert the clinician that the report is not complete and highlight the incomplete justification.

(D)     Fourth, a clinician must complete a progress report before SMART will permit the clinician to complete a subsequent one.

(E)     Fifth, SMART alerts clinicians and other RehabCare employees to incomplete documents, including Plans of Care, Progress Reports, and G-codes, on the resident screen.  The resident screen displays information for a particular patient.  If there is incomplete documentation for that patient, an alert appears in the bottom right corner of the resident screen under the "documentation" alert tab.

165.   In addition to posting alerts, SMART also can generate certain reports detailing incomplete documentation.  For example, SMART can generate Documentation Schedule Reports on a daily basis, showing documentation needing to be completed for each of the patients in their facilities on that day.  RehabCare managers use Documentation Schedule Reports to remind clinicians to complete the documents due on a daily basis.  If clinicians have failed to complete

such documentation, then the RehabCare managers may see the corresponding alert in the SMART system and know that required documentation is incomplete.

166.   SMART also generates Incomplete Documentation Reports showing required documentation not yet completed.   SMART can generate such a report for a facility, an area, or for the whole company.   These reports list, among other information, the patient names and IDs; the type of therapy (*i.e.,* physical therapy, occupational therapy, or speech therapy); the type of document not yet completed (*i.e.,* plan of care, updated plan of care, "TherapistProgress" (a progress report completed by a therapist), "AssistantProgress" (a progress report completed by an assistant therapist); the number of days since the document was due; the payor (*e.g.,* Medicare Part A, Medicare Part B, Medicare Advantage); and the reason the document was incomplete (*e.g.,* partially initiated (initiated but not completed), not initiated, or missing G-code).   RehabCare managers should use Incomplete Documentation Reports to identify incomplete documentation and direct their clinicians to complete the documentation.

167.   Documents are listed as "partially initiated" when they are partially complete but missing certain substantive treatment-related information.   For example, missing information about the patient's diagnosis, reason for therapy, goals, or medical progress will cause the document to be listed in an Incomplete Documentation Report as "partially initiated."   However, if minor information is missing from the document, such as the patient's date of birth, the medical record number, or the type of payor, the document will not be listed in an Incomplete Documentation Report.

168.   As with SMART's alerts to missing COT ARDs, alerts to incomplete Plans of Care and Progress Reports were not "mandatory to clear."   In other words, RehabCare failed to have

SMART programed to require the completion of the required documentation prior to generating an invoice to a client facility.  As a result, RehabCare misled its employees by suggesting that they could ignore the alerts and generate invoices without completing the proper documentation.

169.    Failing to make incomplete Plan of Care and Progress Report alerts "mandatory to clear" had predictable results – between 2012 and 2016 RehabCare clinicians failed to complete over 27,000 required plans of care and progress reports for their patients.

170.    During 2013 (when CMS first required G-codes) and part of 2014, alerts for missing G-codes also were not "mandatory to clear."  Accordingly, in 2013 RehabCare clinicians failed to complete at least 766 G-codes for Medicare Part B, Medicare Advantage, Medicaid, and TRICARE beneficiaries.  However, in 2014, RehabCare programmed SMART so that G-code alerts became "mandatory to clear."  That year, the number of incomplete G-codes for Medicare Part B beneficiaries fell to 190.  In 2015 and 2016, there were no incomplete G-codes.

171.    Table 8 below shows the number of incomplete plans of care (including updated and supplemental plans of care), progress reports, and G-codes for Medicare Part A, Medicare Part B, Medicare Advantage, Medicaid, and TRICARE beneficiaries treated by RehabCare in the calendar years indicated:

| TABLE 8: INCOMPLETE DOCUMENTATION | | | | |
|---|---|---|---|---|
| Year | Incomplete Plans of Care | Incomplete Progress Reports | Incomplete G-codes | Number of Incomplete Documents |
| 2012 | 11 | 121 | 0 | 132 |
| 2013 | 236 | 4,346 | 691 | 5,273 |
| 2014 | 3,485 | 6,443 | 190 | 10,118 |
| 2015 | 4,295 | 7,443 | 0 | 11,738 |
| 2016 | 292 | 730 | 0 | 1,022 |

| TOTALS | 8,319 | 19,083 | 881 | 28,283 |
|--------|-------|--------|-----|--------|

172.   Of the incomplete documents indicated in Table 8, 393 of them corresponded to patients at Kindred SNFs.  On information and belief, in many instances, despite incomplete documentation that was a precondition to payment, Kindred SNFs knowingly made false claims to CMS for treatment rendered by RehabCare clinicians to patients with incomplete documentation indicated in Table 8.  Those claims falsely certified compliance, and did not disclose non-compliance, with documentation requirements.

173.   On information and belief, in many instances connected to the incomplete documentation referenced in Table 8, RehabCare failed to alert its non-Kindred client SNFs to missing documentation for patients residing at the SNFs.  Further, RehabCare knowingly billed those client facilities for treatment rendered to those patients.  RehabCare's client facilities in turn made false claims to CMS for treatment rendered to those patients.  Those claims falsely certified compliance, and did not disclose non-compliance, with documentation requirements.

174.   By failing to alert its client SNFs to incomplete plans of care, progress reports, and G-codes for Medicare Part A, Medicare Part B, Medicare Advantage, Medicaid, and TRICARE beneficiaries, RehabCare knowingly caused the SNFs to present false or fraudulent claims for payment or approval to officers or employees of the United States Government or to contractors, grantees, or other recipients, when the money or property was to be spent or used on the Government's behalf or to advance a Government program or interest, and when the United States Government provided or had provided any portion of the money or property requested or demanded; or was to reimburse such contractors, grantees, or other recipients for any portion of the money or property requested or demanded.

76

*ii.     Treatment Notes and Certifications/Recertifications of Plans of Care*

175.    RehabCare clinicians entered treatment notes on a daily basis into SMART. Although SMART did not alert users or management to the number of incomplete treatment notes, Relator periodically audited the treatment notes kept in SMART for individual facilities.  Often, she found that treatment notes had not been completed.  Subsequently, she would notify the appropriate Area Director of the results of her audits, thereby placing the Area Director on notice that these notes had not been completed.

176.    Similarly, doctors and clinicians certified and recertified plans of care by signing paper copies of the plans of care.  RehabCare did not enter their signatures into SMART, and RehabCare did not track them in SMART.  Rather, RehabCare placed the hard-copies of the signed certifications/recertifications into the patients' medical charts.  Accordingly, SMART Incomplete Documentation Reports did not include the number of incomplete signatures certifying or recertifying of plans of care.

177.    In the course of her duties, Relator audited patient charts at various facilities that she served.  During these audits, she regularly discovered that doctors and clinicians had failed to certify and/or recertify plans of care.  Subsequently, she included the results of her audits in site visit summaries that she conveyed to the appropriate Area Director as well as her immediate supervisor, Matt Sivret.  Through her site visit summaries, Relator informed Sivret that the plans of care were not certified or re-certified.

178.    On information and belief, RehabCare failed to inform its client SNFs of incomplete treatment notes, certifications of plans of care, and recertifications of plans of care.

Accordingly, RehabCare caused its client SNFs to file false claims with CMS for treatment unsupported by documentation required for payment.

179.   On information and belief, despite incomplete treatment notes, certifications, and recertifications of plans of care that were a precondition to payment, Kindred SNFs knowingly made false claims to CMS for treatment rendered by RehabCare clinicians to patients with incomplete treatment notes, certifications, and recertifications of plans of care.  Those claims falsely certified compliance, and did not disclose non-compliance, with documentation requirements.

180.   By failing to alert its client SNFs to incomplete treatment notes and certifications/recertifications of plans of care for Medicare Part A, Medicare Part B, Medicare Advantage, Medicaid, and TRICARE beneficiaries, RehabCare knowingly caused the SNFs to present false or fraudulent claims for payment or approval to officers or employees of the United States Government or to contractors, grantees, or other recipients, when the money or property was to be spent or used on the Government's behalf or to advance a Government program or interest, and when the United States Government provided or had provided any portion of the money or property requested or demanded; or was to reimburse such contractors, grantees, or other recipients for any portion of the money or property requested or demanded.

E.    EXAMPLES OF INCOMPLETE DOCUMENTATION

181.   Table 9 below provides fifteen examples of required documentation that RehabCare failed to complete.  On information and belief, RehabCare falsely billed the SNFs listed in the table and caused them to submit false claims for the therapy corresponding to the incomplete documentation listed.

| | TABLE 9: EXAMPLES OF INCOMPLETE DOCUMENTATION | | | | | |
|---|---|---|---|---|---|---|
| Documentation Due Date | Facility | PT/O T/ST | Patient Initials | Payor | Type of Incomplete Documentation | Reason for Documentation Incomplete |
| 1/16/15 | Kindred TCR-Lafayette | OT | C.R. | Part A | Progress Report | Partially Initiated |
| 1/26/15 | Kindred TCR Eagle Pond | OT | E.N. | Part A | Plan of Care | Partially Initiated |
| 3/15/15 | Kindred Westborough | PT | B.M. | Part B | Updated Plan of Care | Partially Initiated |
| 4/8/15 | Fox Hill Village Rehab. Center | ST | T.W. | Part B | Plan of Care | Partially Initiated |
| 5/23/15 | Kindred TCR Forestview | PT | A.G. | Part A | Plan of Care | Partially Initiated |
| 6/23/15 | Kindred TCR Forestview | OT | M.D. | Part A | Plan of Care | Partially Initiated |
| 9/26/15 | Clark House | PT | J.L. | Part B | Plan of Care | Not Initiated |
| 9/4/15 | Fox Hill Village Rehab. Center | PT | A.N. | Part B | Progress Report | Not Initiated |
| 10/12/15 | Greenbriar Terrace Healthcare | PT | M.L. | Part B | Discharge Summary | Not Initiated |
| 10/23/15 | Kindred Nursing & Rehab. Harborlights | ST | M.H. | Part B | G-code | Missing G-code |
| 10/26/15 | Kindred Nursing & Rehab. Braintree | OT | V.G. | Part B | G-code | Missing G-code |
| 10/28/15 | Kindred TCR Country Estates | PT | W.B. | Part B | G-code | Missing G-code |
| 11/13/15 | Kindred Nursing & Rehab. Laurel Lake | PT | C.M. | Medic aid | Update Plan of Care | Not Initiated |
| 12/30/15 | Kindred TCR Highgate | OT | W.R. | Part B | G-code | Missing G-code |

## F.   REHABCARE   KNOWINGLY   BILLED   FOR   TREATMENT   WITH INCOMPLETE DOCUMENTATION

182.    RehabCare and its officers were well aware that RehabCare had repeatedly failed

to comply with CMS rules and regulations regarding completion of documentation and had filed,

and had caused to be filed, false and fraudulent claims for payment or approval to contractors,

officers, or employees of the United States Government and the States of California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington as well as the Commonwealths of Massachusetts and Virginia.

183.    Not only did the SMART alerts stand as a constant reminder to RehabCare staff of incomplete documentation, but Relator herself also made RehabCare officers aware of this repeated and widespread failure.   Indeed, since 2012, Relator had warned her superiors at RehabCare of the company's persistent failure to develop and maintain incomplete documentation as well as the need to address the matter in order to comply with federal law.   Relator had brought the problem to the attention of her superiors in various ways, including by directly confronting her superiors in a company meeting.   However, RehabCare executives have ignored her warnings repeatedly.

184.    When Relator approached her superiors to flag this issue for them, they knew she possessed the requisite expertise and background to reasonably rely on her representations.   Yet they ignored her warnings.   Her superiors knew, for example, that Relator was responsible for training RehabCare managers, including Program Directors and Area Managers, on ensuring compliance with CMS documentation requirements.   From in or about 2012 until her departure from RehabCare in April 2016, Relator conducted one-on-one trainings and group trainings with Program Directors, Area Managers, and other RehabCare employees on developing and maintaining proper documentation for Medicare Part A and Part B beneficiaries and on using SMART alerts to identify and resolve incomplete documentation.   Among other things, she trained RehabCare employees to use SMART to generate Documentation Schedule Reports, Incomplete

Documentation Reports, and to review the resident screens for their patients for incomplete document alerts. During her trainings, she regularly advised trainees to prioritize compliance with CMS documentation in order to avoid claim denials.

185.     Relator personally made RehabCare aware of the missing documentation, as follows:

(A)     Relator's E-Mailing Incomplete Documentation Reports: From in or about 2012 until her departure in March 2016, Relator regularly generated Incomplete Documentation Reports, which she emailed to the Division Vice Presidents, Regional Vice Presidents, and Area Directors in the territories she served. Through the regular submission of these reports, Relator created a constant reminder for the recipient-managers of these serious compliance defects and conditions of payment that were not being met.

(B)     Relator's Weekly Calls: Additionally, from in or about 2012 until her departure in March 2016, Relator conducted various weekly calls with Division Vice Presidents, Regional Vice Presidents, and Area Directors in the territories she served. During these calls, Relator regularly referenced the Incomplete Documentation Reports that she had circulated prior to the calls. She emphasized to the call participants that RehabCare continued to fail to complete the documentation required to bill for services rendered. Yet little, if anything, was done to address the problems about which she repeatedly warned.

(C)     From in or about 2012 until her departure in March 2016, during weekly calls conducted with Division Vice Presidents, Regional Vice Presidents, and Area

Managers in the territories she served, Relator regularly referenced the Incomplete Documentation Reports that she had circulated prior to the calls. She emphasized to the call participants that RehabCare continued to fail to complete the documentation required to bill for services rendered. Similarly, between 2012 and 2016, Relator participated in weekly calls with Division Vice President of Clinical Operations Matt Sivret and all of the Clinical Performance Specialists. Relator and the other Clinical Performance Specialists updated Mr. Sivret on their activities during these calls. Often, Relator reported that she continued to generate reports on incomplete documentation, and the reports continued to show large volumes of incomplete documents. Nonetheless, Matt Sivret never communicated to Relator that he would take steps to address the problem. Despite Relator's best efforts, her superiors grew to dismiss her constant reminders as almost *pro forma,* and they fell on deaf ears.

(D)    Relator's Monthly Reports:  Relator also used monthly reports to bring the same compliance problem to the attention of Matt Sivret and various other Vice Presidents. From at least January 2013 and continuing through March 2016, Relator submitted to these managers monthly reports, detailing her activities and priorities that month. These reports noted trainings on creating proper documentation and reviewing for completed documentation. The reports also noted ongoing problems with maintaining proper documentation. The RehabCare Vice Presidents who received these reports,

including Matt Sivret, ignored Ms. Reigart's warnings and never responded to the issue
of incomplete documentation that she repeatedly raised.

(E)     Relator's Calls with VP Matt Sivret:  Once again, Relator did not just let
her regular reports speak for themselves.  Relator spoke to Matt Sivret in one-on-one
telephone calls conducted on a monthly basis between 2012 and 2016.  During many of
these calls Relator warned Mr. Sivret about the continuing problem of incomplete
documentation that she saw when reviewing SMART reports.  She advised that while
RehabCare managers were concerned with improving the quality of documentation, she
[Relator] was equally concerned that the required documentation was not being
completed.  Relator suggested to Mr. Sivret that RehabCare refrain from issuing invoices
to its client until completing all documentation.  Mr. Sivret indicated that he would look
into the matter and suggested that the Vice Presidents and Area Directors of Operations
would need to follow-up with Program Directors in their regions.  However, the problem
of incomplete documentation continued.

(F)     Relator's Warnings at Company Meetings:  Relator raised her concerns at
three separate company meetings in conjunction with her concerns about noncompliant
COTs.

(i)     On December 9, 2014, Relator raised the issue of incomplete
documentation at a training for RehabCare management, held in St. Louis,
Missouri.  Mr. Sivret and numerous other employees in the Clinical Operations
Division were present.  In addition to raising concerns about noncompliant COTs,
Relator told them that incomplete documentation was an ongoing issue in the

regions that she supported, that SMART reports showed incomplete documentation, and that she had raised the issue with "operators" (meaning Vice Presidents, Area Directors of Operations, and Program Directors), but that the problem persisted. Mr. Sivret nodded to show that he understood the issue, but then moved on to other topics.

(ii)     On March 23, 2015, Relator raised the issue of incomplete documentation at a subsequent training for RehabCare management held in St. Louis, Missouri. Again, she raised this issue as well as the noncompliant COT issue. Both Matt Sivret and Jim Douthitt, RehabCare's Chief Operating Officer, were present along with numerous other employees in the Clinical Division. As she had at the December 2014 meeting, Relator noted that she continued to see incomplete documentation in SMART reports. Neither Mr. Sivret nor Mr. Douthitt responded to the concerns that she raised about incomplete documentation.

(iii)     In December 2015, Relator raised her concerns during a meeting in Louisville, Kentucky, attended by RehabCare's Clinical and Compliance Departments and presided over by Kindred Senior Vice President for Quality and Care Management Mary Van de Kamp. Among those present at the meeting were Matt Sivret and the Clinical Performance Specialists. During the meeting, Ms. Van de Kamp asked each of the Clinical Performance Specialists to share with the group what, if anything, kept them awake night. Relator responded that she had two main concerns. One was a problem with change of therapy compliance. The second was incomplete documentation.     In response to Relator's concern with COT

84

compliance, Ms. Van de Kamp stated that it was the SNF's responsibility and not RehabCare's responsibility to comply with COT reporting requirements. She did not even respond to the concerns raised about incomplete documentation. Nor did any other RehabCare superiors/officers respond to Relator's expressed concern about incomplete documentation.

186. In addition to Relator's warnings, the following facts, among others, demonstrate that RehabCare was aware of the requirement to develop and maintain certain documentation and its failure to do so:

(A)   Kindred's November 2010 Employee Handbook stated:

The Federal False Claims Act, 31 U.S.C. §§ 3 729-3733, and similar state laws are some of the most important laws that govern our business. The False Claims Act (FCA) and similar state laws impose liability on persons or companies that make or cause to be made false or fraudulent claims to the government for payment or who knowingly make, use or cause to be made or used, a false record or statement to get a false or fraudulent claim paid by the government. These laws apply to Medicare and Medicaid reimbursement and prohibit, among other things:
. . .
   • billing Medicare and Medicaid for undocumented services
. . . .

Kindred Employee Handbook (Nov. 2010), p. 17.

(B)   RehabCare's February 2011 Code of Business Conduct and Organizational

Ethics stated:

RehabCare requires that all patient care documentation and associated billing documents be maintained in an accurate and complete manner in accord with state and federal laws. Patient care documentation is used to ensure quality patient care, team communication, patient safety, support medical necessity, and the continued need of services at the level of care that is being provided.

Incomplete, inaccurate, or missing documentation may lead to an unsafe patient care circumstance or a perception of fraudulent activity.

(C)     Kindred's 2015 "Code of Conduct" stated, "The False Claims Act applies to Medicare and Medicaid program reimbursement and prohibits, among other things, . . . billing for undocumented services . . . ."

(D)     RehabCare training materials and policies and procedures reference CMS' documentation requirements for claims made under Medicare Part A and Part B.  *See, e.g.*, "Rehabilitation Services Documentation Requirements" ("Original Date" 09/01/2014 and "Release Date" 09/01/2014) (setting forth requirements under Medicare Part A and Part B for plans of care, daily treatment notes, and progress reports).

(E)     Materials available on RehabCare's website reference CMS' documentation requirements for claims made under Medicare Part A and Part B.  *See, e.g.*, Documentation Guidelines For Select Payers, http://kindredrehabjobs.com/news/%EF%BB%BFdocumentation-guidelines-for-select-payers-2 (last visited January 17, 2017).

(F)     RehabCare systematically ignored alerts on clinician handheld and traditional computers signaling incomplete documentation.

(G)     RehabCare systematically ignored the alerts that appeared in the SMART resident screen signaling incomplete documentation.

(H)     RehabCare did not program SMART so that the alert for incomplete documentation would be "mandatory to clear," thereby causing its client SNFs to bill CMS without the completed, required documentation.

(I)     On information and belief, from time-to-time MACs denied claims for RehabCare services due to lack of sufficient documentation.

**Count I: Knowingly Presenting False Claims**
**COT Fraud Scheme**
**(31 U.S.C. § 3729(a)(1)(A) (2015))**

187.   Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

188.   Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, knowingly presented or caused to be presented false or fraudulent claims for payment or approval to (1) officers or employees of the United States Government and (2) contractors, grantees, or other recipients, when the money or property was to be spent or used on the Government's behalf or to advance a Government program or interest, and when the United States Government provided or had provided any portion of the money or property requested or demanded; or was to reimburse such contractors, grantees, or other recipients for any portion of the money or property requested or demanded, in violation of 31 U.S.C. § 3729(a)(1)(A).

189.   Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

**Count II: Knowingly Presenting False Claims**
**Incomplete Documentation Fraud Scheme**
**(31 U.S.C. § 3729(a)(1)(A) (2015))**

190.   Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

191.   Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud

Scheme, knowingly presented or caused to be presented false or fraudulent claims for payment or approval to (1) officers or employees of the United States Government and (2) contractors, grantees, or other recipients, when the money or property was to be spent or used on the Government's behalf or to advance a Government program or interest, and when the United States Government provided or had provided any portion of the money or property requested or demanded; or was to reimburse such contractors, grantees, or other recipients for any portion of the money or property requested or demanded, in violation of 31 U.S.C. § 3729(a)(1)(A).

192.    Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

**Count III: False Records or Statements**
**COT Fraud Scheme**
<u>(31 U.S.C. § 3729(a)(1)(B) (2015))</u>

193.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

194.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims made to (1) officers or employees of the United States Government and (2) contractors, grantees, or other recipients, when the money or property was to be spent or used on the Government's behalf or to advance a Government program or interest, and when the United States Government provided or had provided any portion of the money or property requested or demanded; or was to reimburse such contractors, grantees, or other recipients for any portion of the money or property requested or demanded, in violation of 31 U.S.C. § 3729(a)(1)(B).

195.    Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count IV: False Records or Statements
### Incomplete Documentation Fraud Scheme
(31 U.S.C. § 3729(a)(1)(B) (2015))

196.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

197.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims made to (1) officers or employees of the United States Government and (2) contractors, grantees, or other recipients, when the money or property was to be spent or used on the Government's behalf or to advance a Government program or interest, and when the United States Government provided or had provided any portion of the money or property requested or demanded; or was to reimburse such contractors, grantees, or other recipients for any portion of the money or property requested or demanded, in violation of 31 U.S.C. § 3729(a)(1)(B).

198.    Because of the Defendant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### Count V: California False Claims Act
### COT Fraud Scheme
(Cal. Gov't. Code § 12650, *et seq.*)

199.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

200.    This Count is a civil action against Defendant for violating the California False Claims Act, Cal. Gov't. Code § 12650, *et seq.*

201.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of California.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of California.

202.    Because of the Defendant's conduct, the State of California has been damaged.

## Count VI: California False Claims Act
## Incomplete Documentation Fraud Scheme
### (Cal. Gov't. Code § 12650, *et seq.*)

203.    Plaintiff re-alleges and incorporates the allegations paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

204.    This Count is a civil action against Defendant for violating the California False Claims Act, Cal. Gov't. Code § 12650, *et seq.*

205.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of California.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of California.

206.    Because of the Defendant's conduct, the State of California has been damaged.

**Count VII: Colorado Medicaid False Claims Act**
**COT Fraud Scheme**
(Colo. Rev. Stat. § 25.5-4-303.5, *et seq*.)

207.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

208.    This Count is a civil action against Defendant for violating the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, *et seq*.

209.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Colorado.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Colorado.

210.    Because of the Defendant's conduct, the State of Colorado has been damaged.

**Count VIII: Colorado Medicaid False Claims Act**
**Incomplete Documentation Fraud Scheme**
(Colo. Rev. Stat. § 25.5-4-303.5, *et seq*.)

211.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

212.    This Count is a civil action against Defendant for violating the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, *et seq*.

213.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Colorado.  Defendant has also knowingly made or used,

or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Colorado.

214.     Because of the Defendant's conduct, the State of Colorado has been damaged.

## Count IX: Delaware False Claims and Reporting Act
## COT Fraud Scheme
(Del. Code. Ann. tit. 6, § 1201, *et seq.*)

215.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

216.     This Count is a civil action against Defendant for violating the Delaware False Claims and Reporting Act, Del. Code. Ann. tit. 6, § 1201, *et seq*.

217.     Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Delaware.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Delaware.

218.     Because of the Defendant's conduct, the State of Delaware has been damaged.

## Count X: Delaware False Claims and Reporting Act
## Incomplete Documentation Fraud Scheme
(Del. Code. Ann. tit. 6, § 1201, *et seq.*)

219.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

220.     This Count is a civil action against Defendant for violating the Delaware False Claims and Reporting Act, Del. Code. Ann. tit. 6, § 1201, *et seq*.

221.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Delaware.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Delaware.

222.    Because of the Defendant's conduct, the State of Delaware has been damaged.

**Count XI: Florida False Claims Act**
**COT Fraud Scheme**
**(Fla. Stat. Ann. § 68.081, *et seq*.)**

223.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

224.    This Count is a civil action against Defendant for violating the Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq*.

225.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Florida.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Florida.

226.    Because of the Defendant's conduct, the State of Florida has been damaged.

## Count XII: Florida False Claims Act
### Incomplete Documentation Fraud Scheme
(Fla. Stat. Ann. § 68.081, *et seq.*)

227.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

228.    This Count is a civil action against Defendant for violating the Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq*.

229.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Florida.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Florida.

230.    Because of the Defendant's conduct, the State of Florida has been damaged.

## Count XIII: Georgia False Medicaid Claims Act
### COT Fraud Scheme
(Ga. Code. Ann. § 49-4-168, *et seq.*)

231.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

232.    This Count is a civil action against Defendant for violating the Georgia False Medicaid Claims Act Ga. Code. Ann. § 49-4-168, *et seq*.

233.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Georgia.  Defendant has also knowingly made or used, or caused to be made or

used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Georgia.

234.     Because of the Defendant's conduct, the State of Georgia has been damaged.

**Count XIV: Georgia False Medicaid Claims Act**
**Incomplete Documentation Fraud Scheme**
(Ga. Code. Ann. § 49-4-168, *et seq.*)

235.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

236.     This Count is a civil action against Defendant for violating the Georgia False Medicaid Claims Act Ga. Code. Ann. § 49-4-168, *et seq*.

237.     Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Georgia.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Georgia.

238.     Because of the Defendant's conduct, the State of Georgia has been damaged.

**Count XV: Illinois False Claims Act**
**COT Fraud Scheme**
(740  Ill. Comp. Stat.  § 175/1, *et seq.*)

239.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

240.     This Count is a civil action against Defendant for violating the Illinois False Claims Act, 740  Ill. Comp. Stat. § 175/1, *et seq*.

241.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Illinois.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Illinois.

242.    Because of the Defendant's conduct, the State of Illinois has been damaged.

**Count XVI: Illinois False Claims Act**
**Incomplete Documentation Fraud Scheme**
(740 Ill. Comp. Stat. § 175/1, *et seq.*)

243.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

244.    This Count is a civil action against Defendant for violating the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1, *et seq*.

245.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Illinois.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Illinois.

246.    Because of the Defendant's conduct, the State of Illinois has been damaged.

**Count XVII: Indiana False Claims and Whistleblower Protection Law**
**COT Fraud Scheme**
*(Ind. Code Ann. § 5-11-5.5-1, et seq.)*

247.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

248.     This Count is a civil action against Defendant for violating the Indiana False Claims and Whistleblower Protection Law, Ind. Code Ann. § 5-11-5.5-1, *et seq.*

249.     Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Indiana.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Indiana.

250.     Because of the Defendant's conduct, the State of Indiana has been damaged.

**Count XVIII: Indiana False Claims and Whistleblower Protection Law**
**Incomplete Documentation Fraud Scheme**
*(Ind. Code Ann. § 5-11-5.5-1, et seq.)*

251.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

252.     This Count is a civil action against Defendant for violating the Indiana False Claims and Whistleblower Protection Law, Ind. Code Ann. § 5-11-5.5-1, *et seq.*

253.     Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Indiana.  Defendant has also knowingly made or used, or

caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Indiana.

254.    Because of the Defendant's conduct, the State of Indiana has been damaged.

**Count XIX: Iowa False Claims Law**
**COT Fraud Scheme**
(Iowa Code Ann. § 685.1, *et seq.*)

255.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

256.    This Count is a civil action against Defendant for violating the Iowa False Claims Law, Iowa Code Ann. § 685.1, *et seq.*

257.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Iowa.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Iowa.

258.    Because of the Defendant's conduct, the State of Iowa has been damaged.

**Count XX: Iowa False Claims Law**
**Incomplete Documentation Fraud Scheme**
(Iowa Code Ann. § 685.1, *et seq.*)

259.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

260.    This Count is a civil action against Defendant for violating the Iowa False Claims Law, Iowa Code Ann. § 685.1, *et seq.*

98

261.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Iowa.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Iowa.

262.    Because of the Defendant's conduct, the State of Iowa has been damaged.

**Count XXI: Maryland False Claims Law**
**COT Fraud Scheme**
(Md. Code Ann., Gen. Provis. § 8-101, *et seq.*)

263.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

264.    This Count is a civil action against Defendant for violating the Maryland False Claims Law, Md. Code Ann., Gen. Provis. § 8-101, *et seq*.

265.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Maryland.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Maryland.

266.    Because of the Defendant's conduct, the State of Maryland has been damaged.

## Count XXII: Maryland False Claims Law
### Incomplete Documentation Fraud Scheme
(Md. Code Ann., Gen. Provis. § 8-101, *et seq.*)

267.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

268.     This Count is a civil action against Defendant for violating the Maryland False Claims Law, Md. Code Ann., Gen. Provis. § 8-101, *et seq.*

269.     Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Maryland.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Maryland.

270.     Because of the Defendant's conduct, the State of Maryland has been damaged.

## Count XXIII: Massachusetts False Claims Law
### COT Fraud Scheme
(Mass. Gen. Laws. Ann. ch. 12 § 5A, *et seq.*)

271.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

272.     This Count is a civil action against Defendant for violating the Massachusetts False Claims Law, Mass. Gen. Laws. Ann. ch. 12 § 5A, *et seq.*

273.     Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the Commonwealth of Massachusetts.  Defendant has also knowingly made or used, or caused

to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the Commonwealth of Massachusetts.

274.    Because of the Defendant's conduct, the Commonwealth of Massachusetts has been damaged.

### Count XXIV: Massachusetts False Claims Law
### Incomplete Documentation Fraud Scheme
### (Mass. Gen. Laws. Ann. ch. 12 § 5A, *et seq*.)

275.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

276.    This Count is a civil action against Defendant for violating the Massachusetts False Claims Law, Mass. Gen. Laws. Ann. ch. 12 § 5A, *et seq*.

277.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the Commonwealth of Massachusetts.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the Commonwealth of Massachusetts.

278.    Because of the Defendant's conduct, the Commonwealth of Massachusetts has been damaged.

### Count XXV: The Michigan Medicaid False Claim Act
### COT Fraud Scheme
### (Mich. Comp. Laws Ann. § 400.601, *et seq*.)

279.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

280.     This Count is a civil action against Defendant for violating The Michigan Medicaid False Claim Act, Mich. Comp. Laws Ann. § 400.601, *et seq.*

281.     Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Michigan.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Michigan.

282.     Because of the Defendant's conduct, the State of Michigan has been damaged.

### Count XXVI: The Michigan Medicaid False Claim Act
### Incomplete Documentation Fraud Scheme
(Mich. Comp. Laws Ann. § 400.601, *et seq.*)

283.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

284.     This Count is a civil action against Defendant for violating The Michigan Medicaid False Claim Act, Mich. Comp. Laws Ann. § 400.601, *et seq.*

285.     Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Michigan.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Michigan.

286.     Because of the Defendant's conduct, the State of Michigan has been damaged.

**Count XXVII: Minnesota False Claims Act**
**COT Fraud Scheme**
(Minn. Stat. Ann. § 15C.01, *et seq.*)

287.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

288.    This Count is a civil action against Defendant for violating the Minnesota False Claims Act, Minn. Stat. Ann. § 15C.01, *et seq*.

289.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Minnesota.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Minnesota.

290.    Because of the Defendant's conduct, the State of Minnesota has been damaged.

**Count XXVIII: Minnesota False Claims Act**
**Incomplete Documentation Fraud Scheme**
(Minn. Stat. Ann. § 15C.01, *et seq.*)

291.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

292.    This Count is a civil action against Defendant for violating the Minnesota False Claims Act, Minn. Stat. Ann. § 15C.01, *et seq*.

293.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Minnesota.  Defendant has also knowingly made or used,

103

or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Minnesota.

294.    Because of the Defendant's conduct, the State of Minnesota has been damaged.

**Count XXIX: Nevada False Claims Act**
**COT Fraud Scheme**
(Nev. Rev. Stat. Ann. § 357.010, *et seq*.)

295.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

296.    This Count is a civil action against Defendant for violating the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010, *et seq*.

297.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Nevada.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Nevada.

298.    Because of the Defendant's conduct, the State of Nevada has been damaged.

**Count XXX: Nevada False Claims Act**
**Incomplete Documentation Fraud Scheme**
(Nev. Rev. Stat. Ann. § 357.010, *et seq*.)

299.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

300.    This Count is a civil action against Defendant for violating the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010, *et seq*.

301.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Nevada.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Nevada.

302.    Because of the Defendant's conduct, the State of Nevada has been damaged.

### Count XXXI: New Jersey False Claims Act
### COT Fraud Scheme
### (N.J. Stat. Ann. § 2A:32C-1, *et seq.*)

303.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

304.    This Count is a civil action against Defendant for violating the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq*.

305.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of New Jersey.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of New Jersey.

306.    Because of the Defendant's conduct, the State of New Jersey has been damaged.

**Count XXXII: New Jersey False Claims Act**
**Incomplete Documentation Fraud Scheme**
**(N.J. Stat. Ann. § 2A:32C-1, *et seq.*)**

307.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

308.     This Count is a civil action against Defendant for violating the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq.*

309.     Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of New Jersey.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of New Jersey.

310.     Because of the Defendant's conduct, the State of New Jersey has been damaged.

**Count XXXIII: New Mexico Medicaid False Claims Act and**
**New Mexico Fraud Against Taxpayers Act**
**COT Fraud Scheme**
**(N.M. Stat. Ann § 27-14-1, *et seq.* and N.M. Stat. Ann § 44-9-1, *et seq.*)**

311.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

312.     This Count is a civil action against Defendant for violating the New Mexico Medicaid False Claims Act, N.M. Stat. Ann § 27-14-1, et seq. and the the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann § 44-9-1, *et seq.*

313.     Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly

presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of New Mexico.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of New Mexico.

314.    Because of the Defendant's conduct, the State of New Mexico has been damaged.

**Count XXXIV: New Mexico Medicaid False Claims Act and
New Mexico Fraud Against Taxpayers Act
Incomplete Documentation Fraud Scheme**
(N.M. Stat. Ann § 27-14-1, *et seq*. and N.M. Stat. Ann § 44-9-1, *et seq*.)

315.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

316.    This Count is a civil action against Defendant for violating the New Mexico Medicaid False Claims Act, N.M. Stat. Ann § 27-14-1, et seq. and the the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann § 44-9-1, *et seq*.

317.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of New Mexico.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of New Mexico.

318.    Because of the Defendant's conduct, the State of New Mexico has been damaged.

## Count XXXV: New York False Claims Act
### COT Fraud Scheme
(N.Y. State Fin. Law § 187, *et seq.*)

319.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

320.    This Count is a civil action against Defendant for violating the New York False Claims Act, N.Y. State Fin. Law § 187, *et seq*.

321.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of New York.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of New York.

322.    Because of the Defendant's conduct, the State of New York has been damaged.

## Count XXXVI: New York False Claims Act
### Incomplete Documentation Fraud Scheme
(N.Y. State Fin. Law § 187, *et seq.*)

323.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

324.    This Count is a civil action against Defendant for violating the New York False Claims Act, N.Y. State Fin. Law § 187, *et seq*.

325.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of New York.  Defendant has also knowingly made or used,

or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of New York.

326.    Because of the Defendant's conduct, the State of New York has been damaged.

**Count XXXVII: North Carolina False Claims Act**
**COT Fraud Scheme**
(N.C. Gen. Stat. Ann. § 1-605, *et seq.*)

327.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

328.    This Count is a civil action against Defendant for violating the North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605, *et seq.*

329.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of North Carolina.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of North Carolina.

330.    Because of the Defendant's conduct, the State of North Carolina has been damaged.

**Count XXXVIII: North Carolina False Claims Act**
**Incomplete Documentation Fraud Scheme**
(N.C. Gen. Stat. Ann. § 1-605, *et seq.*)

331.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

332.    This Count is a civil action against Defendant for violating the North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605, *et seq.*

333.     Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of North Carolina.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of North Carolina.

334.     Because of the Defendant's conduct, the State of North Carolina has been damaged.

## Count XXXIX: Oklahoma Medicaid False Claims Act
### COT Fraud Scheme
### (Okla. Stat. Ann. tit. 63, § 5053, *et seq.*)

335.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

336.     This Count is a civil action against Defendant for violating the Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. tit. 63, § 5053, *et seq.*

337.     Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Oklahoma.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Oklahoma.

338.     Because of the Defendant's conduct, the State of Oklahoma has been damaged.

**Count XL: Oklahoma Medicaid False Claims Act**
**Incomplete Documetnation Fraud Scheme**
(Okla. Stat. Ann. tit. 63, § 5053, *et seq.*)

339.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

340.    This Count is a civil action against Defendant for violating the Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. tit. 63, § 5053, *et seq.*

341.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Oklahoma.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Oklahoma.

342.    Because of the Defendant's conduct, the State of Oklahoma has been damaged.

**Count XLI: Rhode Island State False Claims Act**
**COT Fraud Scheme**
(R.I. Gen. Laws Ann. § 9-1.1-1, *et seq.*)

343.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

344.    This Count is a civil action against Defendant for violating the Rhode Island State False Claims Act, R.I. Gen. Laws Ann. § 9-1.1-1, *et seq.*

345.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Rhode Island.  Defendant has also knowingly made or used, or caused to be made

or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Rhode Island.

346.    Because of the Defendant's conduct, the State of Rhode Island has been damaged.

## Count XLII: Rhode Island State False Claims Act
### Incomplete Documentation Fraud Scheme
(R.I. Gen. Laws Ann. § 9-1.1-1, *et seq.*)

347.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

348.    This Count is a civil action against Defendant for violating the Rhode Island State False Claims Act, R.I. Gen. Laws Ann. § 9-1.1-1, *et seq*.

349.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Rhode Island.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Rhode Island.

350.    Because of the Defendant's conduct, the State of Rhode Island has been damaged.

## Count XLIII: Tennessee False Claims Act
### COT Fraud Scheme
(Tenn. Code Ann. § 71-5-181, *et seq.*)

351.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

352.    This Count is a civil action against Defendant for violating the Tennessee False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq*.

353.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Tennessee.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Tennessee.

354.    Because of the Defendant's conduct, the State of Tennessee has been damaged.

**Count XLIV: Tennessee False Claims Act**
**Incomplete Documentation Fraud Scheme**
(Tenn. Code Ann. § 71-5-181, *et seq.*)

355.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

356.    This Count is a civil action against Defendant for violating the Tennessee False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq.*

357.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Tennessee.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Tennessee.

358.    Because of the Defendant's conduct, the State of Tennessee has been damaged.

**Count XLV: Texas Medicaid Fraud Prevention Law**
**COT Fraud Scheme**
(Tex. Hum. Res. Code Ann. § 36.001, *et seq.*)

359.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

360.    This Count is a civil action against Defendant for violating the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001, *et seq.*

361.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Texas.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Texas.

362.    Because of the Defendant's conduct, the State of Texas has been damaged.

**Count XLVI: Texas Medicaid Fraud Prevention Law**
**Incomplete Documentation Fraud Scheme**
(Tex. Hum. Res. Code Ann. § 36.001, *et seq.*)

363.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

364.    This Count is a civil action against Defendant for violating the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001, *et seq.*

365.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Texas.  Defendant has also knowingly made or used, or

caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Texas.

366.  Because of the Defendant's conduct, the State of Texas has been damaged.

**Count XLVII: Vermont False Claims Act**
**COT Fraud Scheme**
(Vt. Stat. Ann. tit. 32, § 630, *et seq.*)

367.  Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

368.  This Count is a civil action against Defendant for violating the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630, *et seq*.

369.  Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Vermont.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Vermont.

370.  Because of the Defendant's conduct, the State of Vermont has been damaged.

**Count XLVIII: Vermont False Claims Act**
**Incomplete Documentation Fraud Scheme**
(Vt. Stat. Ann. tit. 32, § 630, *et seq.*)

371.  Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

372.  This Count is a civil action against Defendant for violating the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630, *et seq*.

373.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Vermont.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Vermont.

374.    Because of the Defendant's conduct, the State of Vermont has been damaged.

<strong>Count XLIX: Virginia Fraud Against Taxpayers Act<br>COT Fraud Scheme<br>(Va. Code Ann. § 8.01-216.1, <em>et seq.</em>)</strong>

375.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

376.    This Count is a civil action against Defendant for violating the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*

377.    Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the Commonwealth of Virginia.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the Commonwealth of Virginia.

378.    Because of the Defendant's conduct, the Commonwealth of Virginia has been damaged.

## Count L: Virginia Fraud Against Taxpayers Act
## Incomplete Documentation Fraud Scheme
### (Va. Code Ann. § 8.01-216.1, *et seq.*)

379.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

380.     This Count is a civil action against Defendant for violating the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*

381.     Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the Commonwealth of Virginia.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the Commonwealth of Virginia.

382.     Because of the Defendant's conduct, the Commonwealth of Virginia has been damaged.

## Count LI: Washington Medicaid Fraud False Claims Act
## COT Fraud Scheme
### (Wash. Rev. Code Ann. § 74.66.005, *et seq.*)

383.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 123 as if fully set forth herein.

384.     This Count is a civil action against Defendant for violating the Washington Medicaid Fraud False Claims Act, Wash. Rev. Code Ann. § 74.66.005, *et seq.*

385.     Between October 1, 2011 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the COT Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees

117

of the State of Washington.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Washington.

386.    Because of the Defendant's conduct, the State of Washington has been damaged.

**Count LII: Washington Medicaid Fraud False Claims Act**
**Incomplete Documentaion Fraud Scheme**
<u>(Wash. Rev. Code Ann. § 74.66.005, *et seq.*)</u>

387.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 93 and 124 through 186 as if fully set forth herein.

388.    This Count is a civil action against Defendant for violating the Washington Medicaid Fraud False Claims Act, Wash. Rev. Code Ann. § 74.66.005, *et seq*.

389.    Between January 1, 2012 and the present, Defendant Kindred, by and through its RehabCare Division and its SNFs, in connection with the Incomplete Documentation Fraud Scheme, has knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Washington.  Defendant has also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Washington.

390.    Because of the Defendant's conduct, the State of Washington has been damaged.

## <u>PRAYER FOR RELIEF</u>

Plaintiff demands judgment against the Defendant as follows:

(A)    The amount of the United States' damages, trebled as required by law;

(B)    Such civil penalties as are required by law;

118

(C)     A Relator award in the maximum amount allowed pursuant to 31 U.S.C. §

3730(d) or any other applicable provision of law;

(D)     All costs of this action, including reasonable attorney's fees;

(E)     Further relief that may be just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands that this matter be tried before jury.


*/s/Robert F. Muse*
Robert F. Muse, Esq. (Mass. Bar #543494)
Joshua A. Levy, Esq. (Pro Hac Vice)
Daren H. Firestone, Esq. (Pro Hac Vice)
Cunningham Levy Muse LLP
1250 Connecticut Avenue, NW
Suite 200
Washington, D.C. 20036
rmuse@cunninghamlevy.com
jal@cunninghamlevy.com
dhf@cunninghamlevy.com
*Counsel to Relator*

119

## <u>CERTIFICATE OF SERVICE</u>

Plaintiff-Relator hereby certifies that in compliance with Rule 4 of the Federal

Rules of Civil Procedure, service of this *Qui Tam* Amended Complaint will be made in person or

by first class mail on:

The Honorable Jefferson B. Sessions
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

William D. Weinreb, Acting U.S. Attorney
Attn: AUSA Kriss Basil
United States Attorney's Office
District of Massachusetts
John Joseph Moakley United States Federal Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210

Kathleen Alice Kenealy, Attorney General
Office of the Attorney General
1300 I St.
Sacramento, CA 95814

Saralyn M. Ang-Olson
Bureau of Medi-Cal Fraud & Elder Abuse
Office of the Attorney General
1425 River Park Drive, Suite 300
Sacramento, CA 95815

Cynthia Coffman, Attorney General
Office of the Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203

Robert Booth
Director, MFCU
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 9th Floor
Denver, CO 80203

Mathew Denn, Attorney General
Office of the Attorney General
Carvel State Office Bldg.
820 N. French St.
Wilmington, DE 19801

Kate Keller
Director, MFCU
Medicaid Fraud Control Unit of Delaware
Office of the Attorney General
820 N. French St., 5th Floor
Wilmington, DE 19801

Pam Bondi, Attorney General
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399

James D. Varnado
Director, MFCU
Medicaid Fraud Control Unit of Florida
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399

Christopher M. Carr, Attorney General
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA 30334

Van Pearlberg
Director, MFCU
Medicaid Fraud Control Unit of Georgia
Office of the Attorney General
200 Piedmont Ave. SE
West Tower, 19th Floor
Atlanta, GA 30334

Lisa Madigan, Attorney General
Office of the Attorney General
500 South Second Street
Springfield, IL 62706

Brian Ley
Director, MFCB
Medicaid Fraud Control Bureau

801 South 7th Street, Suite 500-A
Springfield, IL 62794

Curtis Hill, Attorney General
Office of the Attorney General
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204

Matthew Whitmore
Director, MFCU
Medicaid Fraud Control Unit of Indiana
Office of the Attorney General
8005 Castleway Drive
Indianapolis, IN 46250

Tom Miller, Attorney General
Office of the Attorney General
Hoover State Office Building
1305 E. Walnut Street
Des Moines, IA 50319

Joshua J. Happe
Director, MFCU
Medicaid Fraud Control Unit of Iowa
Department of Inspections and Appeals
3rd Floor, Lucas State Office Building
321 E. 12th Street
Des Moines, IA 50319

Brian E. Frosh, Attorney General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

Ilene J. Nathan
Director, MFCU
Medicaid Fraud Control Unit of Maryland
Office of the Attorney General
200 St. Paul Place, 18th Floor
Baltimore, MD 21202

Maura Healy, Attorney General
Office of the Attorney General
1 Ashburton Place
Boston, MA 02108

Toby Unger
Director, MFCU
Medicaid Fraud Control Unit of Mass.
Office of the Attorney General
1 Ashburton Place
Boston, MA 02108

Bill Schuette, Attorney General
Office of the Attorney General
G. Mennen Williams Building, 7th Floor
525 W. Ottawa St.
PO Box 30212
Lansing, MI 48909

David Tanay
Director, MFCU
Medicaid Fraud Control Unit of Michigan
Office of the Attorney General
2860 Eyde Parkway
East Lansing, MI 48823

Lori Swanson, Attorney General
Office of the Attorney General
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101

Chuck Roehrdanz
Director, MFCU
Medicaid Fraud Control Unit of Minnesota
Office of the Attorney General
1200 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101

Adam Paul Laxalt, Attorney General
Office of the Attorney General
100 N. Carson St.
Carson City, NV 89701

Mark N. Kemberling
Director, MFCU
Medicaid Fraud Control Unit of Nevada
Office of the Attorney General
555 East Washington Ave., Suite 3900
Las Vegas, NV 89101

Joseph Foster, Attorney General
Office of the Attorney General
State House Annex
33 Capitol Street
Concord, NH 03301

Brooksley Belanger
Director, MFCU
Medicaid Fraud Control Unit of N.H.
Office of the Attorney General
33 Capitol Street
Concord, NH 03301

Christopher Porrino, Attorney General
Office of the Attorney General
Richard J. Hughes Justice Complex
25 Market Street
PO Box 080
Trenton, NJ 08625

Peter Sepulveda
Director, MCFU
Office of the Attorney General
1 Appollo Drive
Whippany, NJ 07981

Hector Balderas, Attorney General
Office of the Attorney General
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501

Patricia Tucker
Director, MFCU
Medicaid Fraud Control Unit of New Mexico
111 Lomas Blvd., NW, 3rd Floor
Albuquerque, NM 87102

Eric Schneiderman, Attorney General
Office of the Attorney General
The Capitol
Albany, NY 1224-0341

Amy Held
Director, MFCU
Medicaid Fraud Control Unit of New York

120 Broadway, 13th Floor
New York, NY 10271

Josh Stein, Attorney General
Office of the Attorney General
9001 Mail Service Center
Raleigh, NC 27699

Charles Hobgood
Director, MFCU
Office of the Attorney General
5505 Creedmoor Road, Suite 300
Raleigh, NC 27612

Scott Pruitt
Oklahoma Office of Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105

Mykel Fry
Director, MFCU
Oklahoma Office of Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105

Peter Kilmartin, Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903

James F. Dube
Director, MFCU
Medicaid Fraud Control Unit of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, RI 02903

Herbert Slatery III, Attorney General
Office of the Attorney General
PO Box 20207
Nashville, TN 37202

Norman Tidwell
Director, MFCU
Medicaid Fraud Control Unit of Tennessee
Tennessee Bureau of Investigation

901 R.S. Gass Boulevard
Nashville, TN 37216

Ken Paxton, Attorney General
Office of the Attorney General
300 W. 15th Street
Austin, TX 78701

Stormy Kelly
Director, MFCU
Medicaid Fraud Control Unit of Texas
6330 Hwy 290 East, Suite 250
Austin, TX 78723

T. J. Donovan
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609

Jason Turner,
Director, MFCU
Medicaid Fraud Control Unit of Vermont
109 State Street
Montpelier, VT 05609

Mark Herring, Attorney General
Office of the Attorney General
900 East Main Street
Richmond, VA 23219

Randall L. Clouse
Director, MFCU
Medicaid Fraud Control Unit of Virginia
Office of the Attorney General
900 East Main Street, 5th Floor
Richmond, VA 23219

Bob Ferguson, Attorney General
Office of the Attorney General
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504

Douglas D. Walsh
Director, MFCU
Medicaid Fraud Control Unit of Washington

126

PO Box 40114
Olympia, WA 98501

_/s/Robert F. Muse_____
Robert F. Muse, Esq.
rmuse@cunninghamlevy.com
Cunningham Levy Muse, LLP
1250 Connecticut Avenue, NW
Suite 200
Washington, D.C. 200036